## SERVICE *v.* DULLES ET AL.

No. 407.   Argued April 2–3, 1957.—Decided June 17, 1957.

C. *Edward Rhetts* argued the cause for petitioner. With him on the brief were *Warner W. Gardner* and *Alfred L. Scanlan.*

*Donald B. MacGuineas* argued the cause for respondents. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Doub* and *Paul A. Sweeney.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

On December 14, 1951, petitioner, John S. Service, was discharged by the then Secretary of State, Dean Acheson, from his employment as a Foreign Service Officer in the Foreign Service of the United States. This case brings before us the validity of that discharge.

At the time of his discharge in 1951, Service had been a Foreign Service Officer for some sixteen years, during ten of which, 1935–1945, he had served in various capacities in China. In April 1945, shortly after his return to this country, Service became involved in the so-called Amerasia investigation through having furnished to one Jaffe, the editor of the Amerasia magazine, copies of certain of his Foreign Service reports. Two months later, Service, Jaffe and others were arrested and charged with violating the Espionage Act,[1] but the grand jury, in August 1945, refused to indict Service. He was thereupon restored to active duty in the Foreign Service, from which he had been on leave of absence since his arrest, and returned to duty in the Far East.

From then on Service's loyalty and standing as a security risk were under recurrent investigation and review by a number of governmental agencies under the provisions of Executive Order No. 9835,[2] establishing the President's Loyalty Program, and otherwise. He was accorded successive "clearances" by the State Department

---

[1] Act of June 15, 1917, c. 30, 40 Stat. 217, as amended.

[2] 12 Fed. Reg. 1935.

in each of the years 1945, 1946 and 1947,[3] and a fourth clearance in 1949 by that Department's Loyalty Security Board, which, however, was directed by the Loyalty Review Board of the Civil Service Commission, when the case was examined by it on "post-audit," [4] to prefer charges against Service and conduct a hearing thereon. This was done, and on October 6, 1950, after extensive hearings, the Department Board concluded that "reasonable grounds do not exist for belief that . . . Service is disloyal to the Government of the United States . . . ," and that ". . . he does not constitute a security risk to the Department of State." These findings were approved by the Deputy Under Secretary of State, acting pursuant to authority delegated to him by the Secretary.[5] Again, however, the Loyalty Review Board, on post-audit, remanded the case to the Department Board for further consideration.[6] Such consideration was had, this time under the more stringent loyalty standard established by Executive Order No. 10241,[7] amending the earlier Executive Order No. 9835, and again the Department Board, on July 31, 1951, decided favorably to Service. This determination was likewise approved by the Deputy Under Secretary. However, on a further post-audit, the Loyalty Review Board decided to conduct a new hearing itself, which resulted this time in the Board's finding that there was a reasonable doubt as to Service's loyalty, and

---

[3] Hearings before the Subcommittee of the House Committee on Appropriations on the Department of State Appropriation Bill for 1950, 81st Cong., 1st Sess. 298.

[4] See *Peters* v. *Hobby*, 349 U. S. 331, 339–348, for a discussion of the then-existing "post-audit" procedure.

[5] See pp. 382–386 and note 16, *infra*.

[6] This action was based on "supplementary information . . . received from the Federal Bureau of Investigation," the nature of which does not appear in the record.

[7] 16 Fed. Reg. 3690.

in its advising the Secretary of State, on December 13, 1951, that in the Board's opinion Service "should be forthwith removed from the rolls of the Department of State" and that "the Secretary should approve and adopt the proceedings" had before the Board.[8] On the same

[8] The essence of the Loyalty Review Board's action, and its relation to the prior departmental proceedings with respect to Service, are summarized in the State Department's press release of December 13, 1951, as follows:

"The Department of State announced today that the Loyalty Review Board of the Civil Service Commission has advised the Department that this Board has found a reasonable doubt as to the loyalty of John Stewart Service, Foreign Service Officer.

"Today's decision of the Loyalty Review Board is based on the evidence which was considered by the Department's Board and found to be insufficient on which to base a finding of 'reasonable doubt' as to Mr. Service's loyalty or security. Copies of the Opinions of both Boards are attached.

"The Department of State's Loyalty Security Board, on July 31, 1951, had reaffirmed its earlier findings that Service was neither disloyal nor a security risk, and the case had been referred to the Loyalty Review Board for post-audit on September 4, 1951. The Loyalty Review Board assumed jurisdiction of Mr. Service's case on October 9, 1951.

"The Chairman of the Loyalty Review Board in today's letter to the Secretary (full text attached) noted:

" 'The Loyalty Review Board found no evidence of membership in the Communist Party or in any organization on the Attorney General's list on the part of John Stewart Service. The Loyalty Review Board did find that there is a reasonable doubt as to the loyalty of the employee, John Stewart Service, to the Government of the United States, based on the intentional and unauthorized disclosure of documents and information of a confidential and non-public character within the meaning of subparagraph d of paragraph 2 of Part V, "Standards," of Executive Order No. 9835, as amended.'

"The Opinion of the Loyalty Review Board stressed the points made above by the Chairman—that is, it stated that the Board was not required to find and did not find Mr. Service guilty of disloyalty, but it did find that his intentional and unauthorized

day the Department notified Service of his discharge, effective at the close of business on the following day.

The authority and basis upon which the Secretary acted in discharging petitioner are set forth in an affidavit later filed by Mr. Acheson in the present litigation, in which he states:

"2. On December 13, 1951, I received a letter from the Chairman of the Loyalty Review Board of the Civil Service Commission submitting to me that Board's opinion, dated December 12, 1951, in the case of John S. Service, a Foreign Service officer of the Department of State and the plaintiff in this action.

"3. On that same day I considered what action should be taken in the light of the opinion of the Loyalty Review Board, recognizing that whatever action taken would be of utmost importance to the administration of the Government Employees Loyalty Program. I understood that the responsibility was vested in me to make the necessary determination under both Executive Order No. 9835, as

disclosure of confidential documents raised reasonable doubt as to his loyalty. The State Department Board while censoring [*sic*] Mr. Service for indiscretions, believed that the experience Mr. Service had been through as a result of his indiscretions in 1945 had served to make him far more than normally security conscious. It found also that no reasonable doubt existed as to his loyalty to the Government of the United States. On this point the State Department Board was reversed.

"The Chairman of the Loyalty Review Board has requested the Secretary of State to advise the Board of the effective date of the separation of Mr. Service. This request stems from the provisions of Executive Orders 9835 and 10241—which established the President's Loyalty Program—and the Regulations promulgated thereon. These Regulations are binding on the Department of State.

"The Department has advised the Chairman of the Loyalty Review Board that Mr. Service's employment has been terminated."

amended, and under Section 103 of Public Law 188, 82d Congress, as to what action to take.

"4. Acting in the exercise of the authority vested in me as Secretary of State by Executive Order 9835, as amended by Executive Order 10241, and also by Section 103 of Public Law 188, 82d Congress (65 Stat. 575, 581), I made a determination to terminate the services of Mr. Service as a Foreign Service Officer in the Foreign Service of the United States.

"5. I made that determination solely as the result of the finding of the Loyalty Review Board and as a result of my review of the opinion of that Board. In making this determination, I did not read the testimony taken in the proceedings in Mr. Service's case before the Loyalty Review Board of the Civil Service Commission. I did not make any independent determination of my own as to whether on the evidence submitted before those boards there was reasonable doubt as to Mr. Service's loyalty. I made no independent judgment on the record in this case. There was nothing in the opinion of the Loyalty Review Board which would make it incompatible with the exercise of my responsibilities as Secretary of State to act on it. I deemed it appropriate and advisable to act on the basis of the finding and opinion of the Loyalty Review Board. In determining to terminate the employment of Mr. Service, I did not consider that I was legally bound or required by the opinion of the Loyalty Review Board to take such action. On the contrary, I considered that the opinion of the Loyalty Review Board was merely an advisory recommendation to me and that I was legally free to exercise my own judgment as to whether Mr. Service's employment should be terminated and I did so exercise that judgment."

Section 103 of Public Law 188, 82d Congress,[9] upon which the Secretary thus relied, was the so-called McCarran Rider, first enacted as a rider to the Appropriation Act for 1947, which provided:

"Notwithstanding the provisions of . . . any other law, the Secretary of State may, in his absolute discretion, . . . terminate the employment of any officer or employee of the Department of State or of the Foreign Service of the United States whenever he shall deem such termination necessary or advisable in the interests of the United States . . . ."[10]

Similar provisions were re-enacted in each subsequent appropriation act until 1953.[11]

After an attempt to secure further administrative review of his discharge proved unsuccessful, petitioner brought this action, in which he sought a declaratory judgment that his discharge was invalid; an order directing the respondents to expunge from their records all written statements reflecting that his employment had been terminated because there was a reasonable doubt as to his loyalty; and an order directing the Secretary to reinstate him to his employment and former grade in the Foreign Service, with full restoration of property rights and payment of accumulated salary.

While cross-motions for summary judgment were pending before the District Court, this Court rendered its decision in *Peters* v. *Hobby*, 349 U. S. 331, holding that under Executive Order No. 9835, the Loyalty Review Board had no authority to review, on post-audit, determinations *favorable* to employees made by department or agency

---

[9] 65 Stat. 581.

[10] 60 Stat. 458.

[11] See 61 Stat. 288, 62 Stat. 315, 63 Stat. 456, 64 Stat. 768, 65 Stat. 581, 66 Stat. 555. All of these provisions are referred to in this opinion as "the McCarran Rider."

authorities, or to adjudicate individual cases on its own motion. On the authority of that decision, the District Court declared the finding and opinion of the Loyalty Review Board respecting Service to be a nullity, and directed the Civil Service Commission to expunge from its records the Board's finding that there was reasonable doubt as to his loyalty. But since petitioner's removal rested not only upon Executive Order No. 9835, as amended, but also upon the McCarran Rider, the District Court sustained petitioner's discharge as a valid exercise of the "absolute discretion" conferred upon the Secretary by the latter provision, and granted summary judgment in favor of respondents in all other respects.[12]  The Court of Appeals affirmed, 98 U. S. App. D. C. 268, 235 F. 2d

---

[12] The District Court's opinion is unreported. Actually, the Secretary could be considered to have power to discharge petitioner as he did only by virtue of the McCarran Rider. Petitioner was an officer in the Foreign Service of the United States, and as such was entitled to the protection of the Foreign Service Act of 1946, as amended. 22 U. S. C. § 801 *et seq.* That statute authorizes the Secretary of State to separate officers from the Foreign Service "for unsatisfactory performance of duty," *id.,* § 1007, or for "misconduct or malfeasance," *id.,* § 1008. However, under both sections, an officer may not be separated without a hearing before the Board of the Foreign Service established by § 211 of the Act, 22 U. S. C. § 826, and his unsatisfactory performance of duty or misconduct must be established at that hearing. No such hearing was ever afforded petitioner. Executive Order No. 9835 did not vest any additional authority in the heads of administrative agencies to discharge employees. It merely established new standards and procedures for effecting discharges under whatever independent legal authority existed for those discharges. Cf. *Cole* v. *Young,* 351 U. S. 536, 543–544. The only statutory provision which could be deemed to authorize the Secretary to dismiss petitioner without observance of the provisions of the Foreign Service Act was therefore the McCarran Rider. The latter provision thus was an indispensable supplement to the Department's authority if it was to proceed against petitioner under the Loyalty-Security Regulations as it did. See p. 376, *infra.*

215, and this Court granted certiorari, 352 U. S. 905, because of the importance of the questions involved to federal administrators and employees alike.

Petitioner here attacks the validity of the termination of his employment on two separate grounds: *First,* he contends that the Secretary's exercise of discretion was invalid since the findings and opinion of the Loyalty Review Board, upon which alone the Secretary acted, were void, because they were rendered without jurisdiction[13] and were based upon procedures assertedly contrary to due process of law. Even conceding that the Secretary's powers under the McCarran Rider were such that he was not required to state the grounds for his decision, petitioner urges, his decision cannot stand because he did in fact rely upon grounds that are invalid. See *Securities and Exchange Commission* v. *Chenery Corp.,* 318 U. S. 80; *Perkins* v. *Elg,* 307 U. S. 325. *Second,* petitioner contends that the Secretary's action is subject to attack under the principles established by this Court's decision in *Accardi* v. *Shaughnessy,* 347 U. S. 260, namely, that regulations validly prescribed by a government administrator are binding upon him as well as the citizen, and that this principle holds even when the administrative action under review is discretionary in nature. Regulations relating to "loyalty and security of employees" which had been promulgated by the Secretary, petitioner asserts, were intended to govern discharges effected under the McCarran Rider as well as those effected under Executive Order No. 9835, as amended, and because those regulations were violated by the Secretary in this case, so petitioner claims, his dismissal by the Secretary cannot stand. Since, for reasons discussed hereafter, we have concluded that petitioner's second contention must be sustained, we do not reach the first.

---

[13] See *Peters* v. *Hobby, supra,* 349 U. S., at 342–343.

The questions to which we address ourselves therefore are as follows: (1) Were the departmental Regulations here involved applicable to discharges effected under the McCarran Rider? and (2) Were those Regulations violated in this instance? We do not understand the respondents to dispute that the principle of *Accardi* v. *Shaughnessy, supra,* is controlling, if we find that the Regulations were indeed applicable and were violated. We might also add that we are not here concerned in any wise with the merits of the Secretary's action in terminating the petitioner's employment.

## I.

We think it is not open to serious question that the departmental Regulations upon which petitioner relies were applicable to McCarran Rider discharges as well as to those effected pursuant to the Loyalty-Security program. The terms of the Regulations, the fact that the Department itself proceeded in this very case under those Regulations down to the point of petitioner's discharge, representations made by the State Department to Congress relating to its practices under the McCarran Rider, and the announced wish of the President to the effect that McCarran Rider authority should be exercised subject to procedural safeguards designed to protect "the personal liberties of employees," all combine to lead to that conclusion. We also think it clear that these Regulations were valid, so far as their validity is put in issue by the respondents in this case.

A. *The Regulations.*

When the Department's proceedings against the petitioner, which resulted in the "clearances" of October 6, 1950, and July 31, 1951, were begun, the Regulations in effect were those of March 11, 1949, entitled "Regulations and Procedures relating to Loyalty and Security of

Employees, U. S. Department of State." [14]   Section 391 stated the "Authority and General Policy" of the Regulations in three subsections. Subsection 391.1 stated that it was "highly important to the interests of the United States that no person be employed in the Department who is disloyal or who constitutes a security risk." Subsection 391.2 stated that so far as the Regulations related to the handling of loyalty cases, they were promulgated in accordance with Executive Order No. 9835, which had recognized the "necessity for removing disloyal employees from the Federal service and for refusing employment therein to disloyal persons," and the "obligation to protect employees and applicants from unfounded accusations of disloyalty." Subsection 391.3 referred to the language of the McCarran Rider, noting that the Secretary of State had been granted by Congress the right, in his absolute discretion, "to terminate the employment of any officer or employee of the Department of State or of the Foreign Service of the United States whenever he shall deem such termination necessary or advisable in the interests of the United States." "In the exercise of this right," the subsection concluded, "the Department will, so far as possible,[15] afford its employees the same protection as those provided under the Loyalty Program."   And, as we shall see hereafter, the Regulations made no provision for action by the

---

[14] U. S. Department of State, Manual of Regulations and Procedures (1949), § 390 et seq.

[15] This qualification is without significance here in view of the fact that the petitioner's case before the Department was handled, down to the time of his discharge by the Secretary, under these Regulations. See p. 376, infra. Moreover, this phrase was deleted in the 1951 revision of the Regulations, as we note hereafter, p. 376, infra, and the respondents have insisted here that the 1951 revision is controlling, see p. 382, infra.

Secretary himself, under the McCarran Rider or otherwise, except following *unfavorable* action in the employee's case by the Department Loyalty Security Board, after full hearing before that Board on the charges against him, and approval of the Board's action by the Deputy Under Secretary.[16]

In May and September 1951, prior to the time of petitioner's discharge, the Regulations were revised, and the amended § 391 provided even more explicitly than the original that the procedures and standards established were intended to govern exercise of the authority granted by the McCarran Rider. After stating in the first subsection [17] that the Regulations were adopted to implement the Department's policy that "no person be employed in the Department [18] who is disloyal or who constitutes a security risk," the section continues in the next two subsections [19] to state in effect that the Regulations relating to the handling of *loyalty* cases were promulgated in accordance with Executive Order No. 9835, and that those relating to *security* cases were promulgated under

---

[16] We follow the parties in this case in using interchangeably the terms "Deputy Under Secretary" and "Assistant Secretary—Administration." When the Department's 1949 Regulations were promulgated, the official charged with duties under them was the "Assistant Secretary—Administration." At some time thereafter, however, that official's functions were apparently transferred to a Deputy Under Secretary. Cf. Act of May 26, 1949, §§ 3, 4, 63 Stat. 111. To avoid confusion, we have used exclusively the latter title in the text of this opinion, regardless of its technical correctness in the particular instance.

[17] "391.1 *Policy.*" For the Department's 1951 Regulations see U. S. Department of State, Manual of Regulations and Procedures (1951), Vol. I, § 390 *et seq.*

[18] "Department" is defined as including "the Foreign Service of the United States." § 391.3.

[19] "391.2 *Loyalty Authority,*" and "391.3 *Security Authority.*"

the authority of the Act of August 26, 1950 [20] and the McCarran Rider.[21] The phrase "so far as possible," in reference to McCarran Rider authority, was deleted. The Regulations thus drew upon all the sources of authority available to the Secretary with reference to such cases, and purported to set forth definitively the procedures and standards to be followed in their handling.

B. *The Administrative Proceedings in this Case.*

The administrative proceedings held in petitioner's case were unquestionably conducted on the premise that the Regulations were applicable in this instance. The charges were based on the Regulations, and a copy of the Regulations was sent to Service along with the letter of charges. The hearing was scheduled under § 395 of the 1949 Regulations. In its opinion exonerating Service, the Department Board noted, following the Regulations, that "the issues here are (1) loyalty, and (2) security risk." The Board's favorable recommendations came twice before the Deputy Under Secretary for review under §§ 395.6 and 396.7 of these Regulations, and were approved by him. Later, before the Civil Service Commission's Loyalty Review Board, an additional charge was added to the Department's original charges by stipulation of the parties, and the stipulation expressly referred to §§ 392.2 and 393.1a of the Regulations. Indeed, at no time during any of the administrative pro-

---

[20] This statute is referred to in the subsection as "Public Law 733, 81st Congress," being the Act of August 26, 1950, 64 Stat. 476, 5 U. S. C. §§ 22–1, 22–3, which gave to the State Department, among other departments and agencies of the Government, suspension and dismissal powers over their civilian employees when deemed necessary "in the interest of the national security of the United States." Cf. *Cole* v. *Young,* 351 U. S. 536.

[21] Referred to in the subsection as "General Appropriations Act, 1951, Section 1213, Public Law 759, 81st Congress."

ceedings in this case was there any suggestion that the Regulations were not applicable to the entire proceedings and binding upon all parties to the case.

## C. *The Department's Representations to Congress.*

In the spring of 1950, the Department of State submitted to an investigating subcommittee of the Senate Foreign Relations Committee a comprehensive report on the procedures and standards used by the Department in dealing with employee loyalty and security problems. After describing the procedures utilized by the Department in the early post-war period, the report continued as follows:

> ". . . The policy of the Department prior to the passage of the McCarran rider was that if there was reasonable doubt as to an employee's loyalty, his employment was required to be terminated. The McCarran rider freed the hands of the Department in making this policy effective. Basically any reasonable doubt of an employee's loyalty if based on substantial evidence was to be resolved in favor of the Government. After enactment of the McCarran rider the Department did not contemplate that the legislation required or that the people of this country would countenance the use of 'Gestapo' methods or harassment or persecution of loyal employees who were American citizens on flimsy evidence or hearsay and innuendo. The Department proceeded to develop appropriate procedures designed to implement fully and properly the authority granted the Department under the McCarran rider.
>
> "The McCarran rider . . . was the first of a series of provisions included in each subsequent appropriation act which authorized the Secretary of State in his absolute discretion to 'terminate the employment

of any officer or employee of the Department of State or of the Foreign Service of the United States whenever he shall deem such termination necessary or advisable in the interests of the United States.' Accordingly, effective during the 1947 fiscal year, and each fiscal year thereafter, the Department considered the McCarran rider as an additional standard for dealing with security problems in the Department. . . . *In* [its] *considered view the McCarran rider was subject to procedural limitations.* The McCarran rider was not interpreted as permitting reckless discharge or the exercise of arbitrary whims.

.　　　.　　　.　　　.　　　.

"The President's loyalty order of March 21, 1947, prescribed a comprehensive set of standards governing the executive branch as a whole. It was deemed applicable to the Department of State, as well as to other agencies. *The unique powers conferred on the Department as a result of continuous reenactment of the McCarran rider led the Department to promulgate regulations which would encompass its duties and powers both under the Executive order and under the McCarran rider.*" [22]

D. *The President's Letter.*

That the policy of the Secretary to subject his plenary powers under the McCarran Rider to procedural limitations was deliberately adopted, and rested on decisions taken at the highest level, is evidenced by a letter dated September 6, 1950, from President Truman to the Secretary of State, which was made a part of the record below. In that letter, the President advised the Secretary that he had just approved H. R. 7786, the General Appropriation Act, 1951, 64 Stat. 595, 768, § 1213 of

---

[22] S. Rep. No. 2108, 81st Cong., 2d Sess. 15–16 (emphasis supplied).

which re-enacted the McCarran Rider for the current fiscal year. The President continued:

"I am sure you will agree that in exercising the discretion conferred upon you by Section 1213, every effort should be made to protect the national security without unduly jeopardizing the personal liberties of the employees within your jurisdiction. Procedures designed to accomplish these two objectives are set forth in Public Law 733, 81st Congress, which authorizes the summary suspension of civilian officers and employees of various departments and agencies of the Government, including the Department of State.

"In order that officers and employees of the Department of State may be afforded the same protection as that afforded by Public Law 733, it is my desire that you follow the procedures set forth in that law in carrying out the provisions of section 1213 of the General Appropriations Act."

In view of the terms of the Regulations, the course of procedure followed by the Department, and the background materials we have noted, we think that there is no room for doubt that the departmental Regulations for the handling of loyalty and security cases were both intended and considered by the Department to apply in this instance. We cannot accept either of the respondents' present arguments to the contrary. The first argument, as put by the District Court, whose language was adopted by the Court of Appeals,[23] is:

". . . It was not the intent of Congress that the Secretary of State bind himself to follow the provisions of Executive Order 9835 in dismissing employees under Public Law 188. This power of summary dismissal would not have been granted the

---

[23] 98 U. S. App. D. C., at 271, 235 F. 2d, at 218.

Secretary of State by the Congress if the Congress was satisfied that the interests of this country were adequately protected by Executive Order 9835."

We gather from this that the lower courts thought that the Secretary was powerless to bind himself by these Regulations as to McCarran Rider discharges based on loyalty or security grounds. We do not think this is so. Although Congress was advised in unmistakable terms that the Secretary had seen fit to limit by regulations the discretion conferred upon him, see pp. 377–378, *supra,* it continued to re-enact the McCarran Rider without change for several succeeding years.[24]  Cf. *Labor Board* v. *Gullett Gin Co.,* 340 U. S. 361, 366; *Fleming* v. *Mohawk Co.,* 331 U. S. 111, 116. Nor do we see any inconsistency between this statute and the effect of the Regulations upon the Secretary under *Accardi* v. *Shaughnessy,* 347 U. S. 260, already discussed, pp. 372–373, *supra.  Accardi,* indeed, involved statutory authority as broad as that involved here.[25]

The respondents' second argument is that the Regulations refer explicitly to discharges based on loyalty and security grounds, but make no reference to discharges

---

[24] See note 11, *supra.*

[25] *I. e.,* § 19 (c) of the Immigration Act of 1917, as amended: "In the case of any alien (other than one to whom subsection (d) is applicable) who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the Attorney General may . . . suspend deportation of such alien if he is not ineligible for naturalization or if ineligible, such ineligibility is solely by reason of his race, if he finds (a) that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien; or (b) that such alien has resided continuously in the United States for seven years or more and is residing in the United States upon the effective date of this Act." 62 Stat. 1206, 8 U. S. C. (1946 ed., Supp. V) § 155 (c).

deemed "necessary or advisable in the interests of the United States"—the sole McCarran Rider standard—and hence were not applicable to such discharges. But, as has already been demonstrated, both the Regulations and their historical context show that the Regulations were applicable to McCarran Rider discharges, at least to the extent that they were based on loyalty or security grounds, and we do not see how it could seriously be considered, as the respondents now seem to urge, that Service was not discharged on such grounds. The Secretary's affidavit,[26] and also the Department's formal notice to Service of his discharge,[27] both of which, among other things, refer to Executive Order No. 9835 as well as to the McCarran Rider as authority for the Secretary's action, unmistakably show that the discharge was based on such grounds.

---

[26] See pp. 368–369, *supra.*

[27] This notice read:

"My dear Mr. Service:

"The Secretary of State was advised today by the Chairman of the Loyalty Review Board of the U. S. Civil Service Commission that the Loyalty Review Board has found that there is a reasonable doubt as to your loyalty to the Government of the United States. This finding was based on the intentional and unauthorized disclosure of documents and information of a confidential and non-public character within the meaning of subparagraph d of Paragraph 2 of Part V of Executive Order 9835, as amended. The Loyalty Review Board further advised that it found no evidence of membership on your part in the Communist Party or in any organizations on the Attorney General's list.

"Pursuant to the foregoing, the Secretary of State, under the authority of Executive Order 9835, as amended, and Section 103 of Public Law 188, 82nd Congress, has directed me to terminate your employment in the Foreign Service of the United States as of the close of business December 14, 1951.

"In view thereof, you are advised that your employment in the Foreign Service of the United States is hereby terminated effective [at the] close of business December 14, 1951."

We now turn to the question whether the manner of petitioner's discharge was consistent with the Department's Regulations.

## II.

Preliminarily, it must be noted that the parties are in dispute as to which of the two sets of Regulations—those of 1949 or those of 1951—is applicable to petitioner's case, assuming, as we have held, that one or the other must govern. The departmental proceedings against petitioner were begun and were conducted under the 1949 Regulations. However, prior to petitioner's discharge in December 1951, the revised Regulations of May and September 1951 had become effective, and it is under those Regulations, the respondents say, that Service's discharge must be judged.[28] On the other hand, the petitioner contends that the 1949 Regulations remained applicable to his case, since he was not advised of the existence of the 1951 Regulations until after his discharge had been accomplished and the present court proceedings had been commenced.[29] However, it is unnecessary for us to make a choice between the two sets of Regulations, for we find the manner in which petitioner was discharged to have been inconsistent with both.

---

[28] The respondents argue that the proper rule to be applied is that of *Vandenbark* v. *Owens-Illinois Glass Co.*, 311 U. S. 538, holding that a change in the applicable law after a case has been decided by a *nisi prius* court, but before decision on appeal, requires the appellate court to apply the changed law. And see *Ziffrin, Inc.* v. *United States*, 318 U. S. 73.

[29] Petitioner argues that the decisions cited in note 28, *supra*, are not in point here because, *inter alia*, the changed regulations were invalid as to him under the Federal Register Act, 49 Stat. 502, 44 U. S. C. § 307, and the Administrative Procedure Act, 60 Stat. 238, 5 U. S. C. § 1002, because not published in the Federal Register.

A. *The 1949 Regulations.*

In terms of the 1949 Regulations, the vice we find in petitioner's discharge is that the Secretary had no right to dismiss the petitioner for loyalty or security reasons unless and until the Deputy Under Secretary, acting upon the findings of the Department's Loyalty Security Board, had recommended such dismissal. In other words, the Deputy Under Secretary in this instance having approved the findings of the Loyalty Security Board favorable to petitioner, the Secretary, consistently with these Regulations, could not, without more, dismiss the petitioner.

The basis for this conclusion will appear from a consideration of the procedural scheme established by the 1949 Regulations relating to loyalty and security cases. In outline that scheme involved the following procedural steps:

(1). The filing of charges, upon notice to the employee involved, accompanied by adequate factual details as to their basis, and a statement as to the employee's work and pay status pending further action.[30]

(2) A hearing on such charges, if requested by the employee, before the Department's Loyalty Security Board, whose determination, together with the record of the hearings, were then to be forwarded to the Deputy Under Secretary for review.[31]

(3) Upon such review the Deputy Under Secretary was empowered (i) to return the case to the Board for further investigation or action; (ii) to decide in favor of the employee, and to so notify him

[30] §§ 394.13, 394.15, 395.1.
[31] §§ 395.1, 395.53.

in writing; or (iii) to decide against the employee, and to notify him of his right to appeal to the Secretary within 10 days thereafter.[32]

(4) In the event of such an appeal, the Secretary was empowered (i) to decide favorably to the employee, and to so notify him in writing; or (ii) to decide against the employee, and to notify him of such decision, and further, in a loyalty case, of his right to appeal to the Loyalty Review Board within 20 days thereafter.[33]

(5) If, upon such an appeal, the Loyalty Review Board decided adversely to the employee and made an "advisory" recommendation to the Secretary that the employee should be removed from employment under the applicable loyalty standards, the Department was to take prompt administrative action to that end. On the other hand if the Board decided favorably to the employee the Secretary was empowered (i) to restore the employee to duty and "close the case"; (ii) to permit the employee to resign; or (iii) to terminate his employment under the authority conferred by the McCarran Rider "or other appropriate authority." [34]

From this survey, three things appear as to the handling of loyalty and security cases under the 1949 Regulations which are of significance in this case. *First,* following the decision of the Deputy Under Secretary upon a determination of the Department Loyalty Security Board, there was to be an appeal to the Secretary *only* if the Deputy's action had been adverse to the employee. In other words, under these Regulations the action of the

[32] §§ 395.6, 396.11.
[33] §§ 396.2, 396.3.
[34] §§ 396.4, 396.5.

Deputy Under Secretary, if *favorable* to the employee, was to be final, the Secretary reserving to himself power to act further only if his Deputy's action was *unfavorable* to the employee.[35]    *Second,* there was likewise an appeal to the Loyalty Review Board from the Secretary's decision *only* if his action was *adverse* to the employee. Again, in other words, a decision of the Secretary favorable to the employee was to be final, and immune from further action by the Loyalty Review Board on post-audit, a rule since confirmed by our decision in *Peters* v. *Hobby, supra.    Third,* the Secretary reserved the right to deal with such a case under his McCarran Rider authority, outside the Regulations, only in instances where, upon an employee's appeal to the Loyalty Review Board from an unfavorable decision by the Secretary, the decision of that body was favorable to the employee.

Granted, as the respondents argue, that these Regulations gave the petitioner (a) no right of appeal to the Secretary from the Deputy Under Secretary's *favorable*

---

[35] That this was understood to be the effect of the Regulations is indicated by Department of State Press Release No. 247, March 13, 1950, which is reprinted in S. Rep. No. 2108, 81st Cong., 2d Sess. 254.    Deputy Under Secretary of State John E. Peurifoy is there quoted as stating, in reply to charges made on the floor of the Senate:

". . . I am in full charge of loyalty matters and . . . am fully prepared to deal with these charges.

"Gen. George C. Marshall, as Secretary of State, vested in me full responsibility and authority for carrying out the loyalty and security program of the Department of State, and I have continued to exercise the same responsibility and authority under Secretary Dean Acheson.

"My decisions on matters of loyalty and security within the Department are *final,* subject, however, under the law, *in certain instances* to appeal to the Secretary and the President's Loyalty Review Board.    Since the loyalty and security program was launched in the Department, however, there has not been a single instance in which a decision made by me has been reversed or overruled in any way by Secretary Acheson."    (Emphasis supplied.)

decision, and (b) no right of appeal at all from the action of the Loyalty Review Board, it does not follow, as the respondents then argue, that the Secretary was free to dismiss the petitioner. For, as has already been observed, the Regulations left the Secretary *functus officio* with respect to such cases once the Deputy Under Secretary had made a determination favorable to the employee. So here when the Deputy Under Secretary approved the Loyalty Security Board's action of July 31, 1951, clearing the petitioner, under these Regulations the case against Service was closed.[36] Hence Service's subsequent discharge by the Secretary must be deemed to have been in contravention of these 1949 Regulations.[37] The situation under the 1949 Regulations was thus closely analogous to that which obtained in *Accardi* v. *Shaughnessy, supra.* There, the Attorney General bound himself not to exercise his discretion until he had received an impartial recommendation from a subordinate board. Here, the

---

[36] Section 396.7 of the Regulations provided:

"If the Assistant Secretary—Administration or the Secretary of State shall, during his consideration of any case, decide affirmatively that an officer or employee is not disloyal and does not constitute a security risk and that his case should be closed, such officer or employee shall be restored to duty, if suspended, and the record shall show such decision."

In holding as we do we by no means imply that under these Regulations the action of the Deputy Under Secretary had the effect of "closing" petitioner's case irrevocably and beyond hope of recall. No doubt proper steps could have been taken to reopen it in the Department. But, consistent with his Regulations, we think that the Secretary could in no event have discharged the petitioner, as he did here, without the required action first having been taken by the Department's Loyalty Security Board and the Deputy Under Secretary.

[37] In view of this conclusion, it becomes unnecessary to consider the other respects in which petitioner claims that his discharge contravened the 1949 Regulations.

Secretary bound himself not to act at all in cases such as this, except upon appeal by employees from determinations unfavorable to them. We see no relevant ground for distinction.

## B. *The 1951 Regulations.*

A similar conclusion must be reached if the 1951 Regulations are deemed applicable to petitioner's case. Section 393.1 of those Regulations provides:

> "The standard for removal from employment in the Department of State under the authority referred to in section 391.3 shall be that on all the evidence reasonable grounds exist for belief that the removal of the officer or employee involved is necessary or advisable in the interest of national security. *The decision shall be reached after consideration of the complete file, arguments, briefs, and testimony presented."* (Emphasis added.)

The "authority referred to in section 391.3," as we have already noted, included the McCarran Rider.[38] In light of the former Secretary's affidavit [39] there is no room for dispute that no attempt was made to comply with this section of the Regulations,[40] as indeed the respondents' brief virtually concedes.

The respondents argue that this provision was not violated in petitioner's case because "the only decision to which Section 393.1 relates is that the removal of the

---

[38] See pp. 375–376, *supra.*

[39] See pp. 368–369, *supra.*

[40] We do not, of course, imply that the Regulations precluded the Secretary from discharging any individual without *personally* reading the "complete file" and considering "all the evidence." No doubt the Secretary could delegate that duty. But nothing of the kind appears to have been done here.

officer or employee involved is 'necessary or advisable in the interest of national security,' " the standard laid down in the Act of August 26, 1950,[41] and that "[n]othing in this section purports to prescribe the procedure to be followed in determining that removal is 'necessary or advisable in the interests of the United States,' " the standard contained in the McCarran Rider. But since § 391.3, which is incorporated by reference into § 393.1, specifically subjected the exercise of the Secretary's McCarran Rider authority, in such cases as this, to the operation of the 1951 Regulations, it seems clear that the necessary effect of § 393.1 was to subject the exercise of that authority to the substantive standards prescribed by that section, namely, those established by the Act of August 26, 1950,[42] and also to the procedural requirements that such cases must be decided "on all the evidence" and "after consideration of the complete file, arguments, briefs, and testimony presented." The essential meaning of the section, in other words, was that the Secretary's decision was required to be on the merits. While it is of course true that under the McCarran Rider the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so, as we have already held, and having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them.

It being clear that § 393.1 was not complied with by the Secretary in this instance, it follows that under the *Accardi* doctrine petitioner's dismissal cannot stand,

---

[41] See note 20, *supra*.

[42] Sections 393.2 and 393.3 further refined the standard by defining five classes of persons constituting security risks, and listing five factors which were to be taken into account, together with possible mitigating circumstances.

regardless of whether the 1951, rather than the 1949, Regulations are deemed applicable in his case.[43]

For the foregoing reasons the judgment of the Court of Appeals must be reversed, and the case remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Clark took no part in the consideration or decision of this case.

---

[43] Because of this conclusion it is unnecessary to deal with the other respects in which petitioner claims his discharge violated the 1951 Regulations.