**HETEROCHEMICAL CORPORATION, et al., Plaintiffs,**

v.

**FOOD AND DRUG ADMINISTRATION, Frank E. Young, Commissioner of Food and Drugs, Otis R. Bowen, Secretary of Health and Human Services, Defendants.**

No. 86 Civ. 0864.

United States District Court, E.D. New York.

Sept. 23, 1986.

Joel E. Hoffman, Sutherland, Asbill & Brennan, Washington, D.C., Stephen M. Hudspeth, Lord, Day & Lord, New York City, for plaintiffs.

Gerald C. Kell, Office of Consumer Litigation, Civ. Div., U.S. Dept. of Justice, Washington, D.C., David Nocenti, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for defendants.

GLASSER, District Judge:

Plaintiffs Heterochemical Corporation and William Galler ("Heterochemical") have brought this action against the Food and Drug Administration ("FDA") seeking to require the FDA to enforce the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA" or "the Act") with respect to certain products which it contends are being unlawfully marketed by its competitors. The action is now before the Court on the FDA's motion to dismiss on the ground that its decision not to take certain enforcement steps in this case is not subject to review by this Court. For the reasons stated herein, the motion will be denied.

## I. Background

### A. Statutory Scheme

Before turning to the facts of this case, it is necessary to survey briefly the relevant provisions of the FDCA. The FDCA prohibits "[t]he introduction or delivery into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a). A food is deemed to be adulterated "if it is, or it bears or contains, any food additive which is unsafe." *Id.* § 342. The Act, in turn, provides that "[a] food additive shall, with respect to any particular use or intended use of such additive, be deemed unsafe" unless such use is in conformity with a food additive regulation. *Id.* § 348(a). Finally, "food additive" is defined to include all animal feed ingredients except those covered by a "prior sanction" issued before September 6, 1958 and those generally recognized as safe ("GRAS") either based on common use in food prior to January 1, 1958 or based on data developed through scientific procedures. *Id.* § 321(s). Working backwards, these statutes provide that no animal feed ingredient may be introduced into interstate commerce unless it is GRAS or prior-sanctioned (and thus is not a food additive) or it is used in conformity with a food additive regulation.

### B. Factual Background

Heterochemical is a manufacturer of swine and poultry feed ingredients known as Vitamin K Active Substances ("VKAS"). Heterochemical markets two VKAS products, menadione dimethyl primidinol bisulfite ("MPB"), marketed under the name Hetrazeen, and menadione sodium bisulfite complex ("MSBC"), sold under the name Hetrogen K. The use of MPB in swine, chicken, and turkey rations at specified levels is authorized by a food additive regulation, 21 C.F.R. § 573.620. MSBC is prior-sanctioned for use in poultry feeds at levels of 2 to 4 grams per ton.

In 1974, Heterochemical petitioned the FDA to enforce the FDCA against three VKAS products sold by its competitors. These products are menadione sodium bisulfite ("MSB"), MSBC in a chemically distinct form from that sold by Heterochemical and thus not covered by the prior sanction, and MSBC marketed for use other than in poultry feeds and not authorized by a food additive regulation. In August 1976, the FDA published notice of Heterochemical's petition and sought public comment. Almost seven years later, in April 1983, the FDA denied Heterochemical's petition. Heterochemical alleges, and we take this allegation to be true for purpose of this motion, that the FDA made "every predicate finding necessary to a determination that the marketing of the challenged VKAS products is in fact unlawful." Heterochemical's Brief at 1. In other words, the FDA found that the animal feed ingredients sold by Heterochemical's competitors were neither GRAS or prior-sanctioned, nor were they covered by a food additive regulation. Nevertheless, although these findings indicate that these products could not lawfully be introduced into interstate commerce, the FDA decided it would take no further action, concluding that "VKAS have been added to animal food for more than 30 years, without apparent animal or human safety problems." 48 Fed.Reg. 16750.

### C. Heckler v. Chaney

Heterochemical, dissatisfied with the FDA's disposition of its petition, brought this action to compel the FDA to do more. The FDA moves to dismiss this action on the ground that its decision to enforce or not to enforce is immune from judicial review. This argument is predicated entirely on *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), decided by the United States Supreme Court two terms ago.

In *Chaney*, a group of prison inmates sentenced to die by lethal injection petitioned the FDA arguing that the drugs that were to be administered to them had not been approved as "safe and effective" for human execution. They argued that the distribution of the drugs in interstate commerce for other than their intended and

approved purpose constituted a violation of the FDCA. The FDA refused to take action, but was ordered to do so by the Court of Appeals for the District of Columbia Circuit. *Chaney v. Heckler,* 718 F.2d 1174 (D.C.Cir.1983). The Supreme Court reversed, endeavoring to determine "the extent to which determinations by the FDA *not to exercise* its enforcement authority over the use of drugs in interstate commerce may be judicially reviewed." 105 S.Ct. at 1654 (emphasis in original).

The Court began with a discussion of § 701(a)(2) of the Administrative Procedure Act, which bars review of administrative agency action when that action "is committed to agency discretion by law." The Court interpreted this section to mean that "even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 1655. Applying this standard, the Court established a presumption that "[r]efusals to take enforcement steps," *id.* at 1655–56 are not reviewable. The Court stressed the unsuitability of review of such decisions, pointing out, *inter alia,* that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 1656.

Having established this presumption, the Court noted that "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* As an example of a case where that presumption was rebutted, the Court cited the case of *Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). In that labor case, the statute provided that, upon filing of a complaint by a union member, "[t]he Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation ... has occurred ... he shall ... bring a civil action...." The Court found that this statute "quite clearly withdrew discretion from the agency and provided guidelines for ex-

ercise of its enforcement power." *Id.* 105 S.Ct. at 1657.

The Court then addressed whether, in the circumstances before it, the enforcement discretion of the FDA was in any way limited. The Court rejected three arguments put forward by the plaintiffs in that case. First, the Court found that the FDCA's substantive prohibitions "are simply irrelevant to the agency's discretion to refuse to initiate proceedings." *Id.* at 1658. Second, the Court found that an agency "policy statement" which had never been adopted, and which the Court characterized as "vague," did not "override the agency's express assertion of unreviewable discretion ..." *Id.* Finally, the Court rejected an argument based on 21 U.S.C. § 336, which provides that the FDA is not required

to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this Act whenever [it] believes that the public interest will be adequately served by a suitable written notice or warning.

The Supreme Court explained:

Respondents seek to draw from this section the negative implication that the Secretary is *required* to report for prosecution all "major" violations of the Act, however those might be defined, and that it therefore supplies the needed indication of an intent to limit agency enforcement discretion. We think that this section simply does not give rise to the negative implication which respondents seek to draw from it.

*Id.* at 1659 (emphasis in original).

## II. *Discussion*

The government argues that *Heckler v. Chaney,* which deals with the same agency, the FDA, and the same situation, a decision not to take enforcement steps, forcloses any result but dismissal of this action. Initially, this argument appears to have a great deal of force. On closer inspection, however, the situations in *Chaney* and in this case may be seen as quite distinct. Where *Chaney* dealt with a deci-

sion not to investigate a possible violation of the FDCA, this case deals with a situation in which the FDA did investigate—it solicited comments from interested parties and evaluated those comments in some fashion over a period of seven years. Where *Chaney* dealt with an initial decision not to commit agency resources, here, the FDA did commit agency resources, carrying out an investigation and publishing its findings. Highlighting these differences, Heterochemical offers three arguments for distinguishing *Chaney*. The Court finds that at least two of these arguments are sufficient to withstand a motion to dismiss.

First, like the plaintiffs in *Chaney*, Heterochemical relies on 21 U.S.C. § 336. Although the Court rejected the argument put forward in *Chaney* in the language quoted earlier, *see* p. 273 *supra*, the Court also stated:

> The section is not addressed to agency proceedings designed to discover the existence of violations, but applies only to a situation where a violation has already been established to the satisfaction of the agency. We do not believe the section speaks to the criteria which shall be used by the agency for investigating *possible* violations of the act.

*Id.* at 1659 (emphasis in original). Relying on this language, Heterochemical argues that *Chaney* specifically left open a case like this one, where, rather than questioning the agency's refusal to investigate, what is challenged is the agency's refusal to act after having conducted an investigation and having found a violation.

The government's response to this argument is to emphasize that, in the Court's language, a violation must be "established to the satisfaction of the agency." It argues that the FDA has complete discretion to determine whether it is satisfied that a violation exists and in determining whether that violation is major or minor. The Court is unprepared to accept this argument. In *Dunlop, supra,* a statute required the Secretary of Labor to investigate possible violations. The Supreme Court found that a court could require the Secretary to state

his reasons for not taking action upon the conclusion of an investigation. Unlike *Dunlop,* as *Chaney* clearly held, the FDA is not required to investigate possible violations of the FDCA. Having conducted such an investigation as it appears to have done in this case, however, it may be appropriate for the Court to review the FDA's assertion that it is not satisfied as to the existence of a violation to determine whether that assertion "is so irrational as to [be] arbitrary and capricious." *Dunlop,* 421 U.S. at 575, 95 S.Ct. at 1861–62. This narrow inquiry could be made by the Court without deciding whether a violation should be considered major or minor, thus leaving the prosecutorial discretion of the agency intact.

A second argument made by Heterochemical provides an even surer footing for judicial action in this case. That argument is based upon the Supreme Court's reservation of the question "whether an agency's rules might under certain circumstances provide courts with adequate guidelines for informed judicial review of decisions not to enforce," *Chaney,* 105 S.Ct. at 1658, and the basic tenet of administrative law that an agency is bound to follow its own regulations. *See Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1156, 1157, 1 L.Ed.2d 403 (1957) ("[R]egulations validly prescribed by a government administrator are binding upon him as well as the citizen, and ... this principle holds even when the administrative action under review is discretionary in nature."). *See also Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir.1985) ("[T]he agency itself can often provide a basis for judicial review through the promulgation of regulations or announcement of policies. Once an agency has declared that a given course is the most effective way of implementing the statutory scheme, the courts are entitled to closely examine agency action that departs from this stated policy.") (footnote omitted).

Heterochemical argues that the FDA's actions in this case are governed by 21 C.F.R. § 570.38. Paragraph (b)(1) of that regulation provides that

the Commissioner ... on the petition of any interested person ... may issue a notice in the Federal Register proposing to determine that a substance is not GRAS and is a food additive subject to Section 409 of the Act.

After allowing for comment by interested parties, the regulation, at paragraph (b)(3), continues:

The Commissioner will evaluate all comments received. If he concludes that there is a lack of convincing evidence that the substance is GRAS or is otherwise exempt from the definition of a food additive ... he will publish a notice thereof in the Federal Register. If he concludes that there is continuing evidence that the substance is GRAS, he will publish an order in the Federal Register listing the substance ... as GRAS.

Assuming the former conclusion, that a substance is neither GRAS nor otherwise exempt from the definition of a food additive, the possible contents of the notice required to be published are described in paragraph (c):

A Federal Register notice determining that a substance is a food additive shall provide ... as follows:

(1) It may promulgate a food additive regulation governing use of the additive.

(2) It may promulgate an interim food additive regulation governing use of the additive.

(3) It may require discontinuation of the additive.

(4) It may adopt any combination of the above three approaches for different uses or levels of use of the additive.

The argument derived from this regulation is quite simple. Heterochemical alleges, and the FDA's conclusions seem to reflect, that the FDA was not convinced that the competing products were GRAS. Yet it published no notice of the type described in paragraph (c).

In responding to this argument, the government does not attack its theoretical underpinnings, i.e., that an agency is bound to follow its own regulations. Instead, it suggests an alternative reading of the reg-

ulation as not requiring anything of the FDA at all. The government relies on paragraph (a) of the regulation, which provides:

The Commissioner may, ... publish a notice in the Federal Register determining that a substance is not GRAS and is a food additive subject to section 409 of the Act.

The government argues that because this paragraph is couched in permissive language, the FDA is never required to publish such a notice. This reading is unconvincing. To read the language of paragraph (a) as modifying the mandatory language of paragraph (b)(3) would be to render the latter language superfluous. Reading the regulation so as to give effect to all of its parts, *see Chaney*, 105 S.Ct. at 1655, it appears that paragraph (a) does not modify paragraph (b) but supplements it, allowing the FDA to act with respect to food additives without following the notice and comment provisions provided for in the latter paragraph.

Moreover, the FDA's current reading is at odds with its former understanding of the regulation requirements. When it originally acted on Heterochemical's petition, the FDA stated:

The Commissioner will evaluate all comments received. If it is concluded that there is convincing evidence that the vitamin K active substances are GRAS, a regulation will be published affirming the substances as GRAS. If there is a lack of convincing evidence that the substances are GRAS, a notice will be published that such substances are food additives as defined in section 201(g) of the act. If he determines that the substances are food additives, the Commissioner may: (1) Promulgate a food additive regulation governing use of the additives; or (2) promulgate an interim food additive regulation governing use of the additive; or (3) require discontinuation of the additive; or (4) adopt any combination of the above approaches.

41 Fed.Reg. 35009. This statement indicates that the FDA thought itself bound to

adopt one of the above alternatives. Now that the FDA has failed to adopt any of them, the Court finds that it is empowered to review this failure.

*Conclusion*

The motion to dismiss is denied.

SO ORDERED.