**HETEROCHEMICAL CORPORATION,
et al., Plaintiffs,**

v.

**FOOD AND DRUG ADMINISTRATION,
et al., Defendants.**

No. CV–86–0864.

United States District Court,
E.D. New York.

July 15, 1990.

Joel E. Hoffman, William K. Tom, Sutherland, Asbill & Brennan, Washington, D.C., Stephen M. Hudspeth, Lord Day & Lord, New York City, for plaintiffs.

David Nocenti, Asst. U.S. Atty., Brooklyn, N.Y., for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiffs in this action moved for summary judgment, and defendants have cross-moved. Since there are no material factual issues in dispute, this court must now render judgment as a matter of law.

### I. *Facts*

Heterochemical manufactures swine and poultry feed ingredients called Vitamin K Active Substances ("VKAS"). They market two kinds of VKAS, menadione dimethyl primidinol bisulfite ("MPB"), and menadione sodium bisulfite complex ("MSBC"). MPB may be used in swine, chicken, and turkey feed at levels specified by a food additive regulation, 21 C.F.R. § 573.620. MSBC is "prior sanctioned"[1] for use in poultry feed at levels of 2 to 4 grams per ton.

In 1974, Heterochemical petitioned the FDA to determine the legal status under the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.*, of certain VKAS products its competitors were marketing either in forms chemically distinct from that made by Heterochemical, or for use other than in poultry feed (and thus not prior sanctioned). Under the FDCA, if a food is not prior sanctioned it is considered a "food additive," unless it is shown to be generally recognized as safe ("GRAS"). 21 U.S.C. § 321(s). Food addi-

---

1. Under 21 U.S.C. § 321(s), a substance is not considered a food additive, and therefore not presumed unsafe, if it was sanctioned for use prior to January 1, 1958.

tives are in turn deemed "unsafe," and therefore barred from sale in interstate commerce, unless they are used in conformance with an FDA regulation. *Id.,* §§ 331(a), 342, 348(a). The procedure for determining the food additive status of a food is contained in 21 C.F.R. Part 570.

On August 11, 1976, the FDA published a notice in the Federal Register (the " '76 Notice"). This notice stated that, in response to a petition from Heterochemical, the Commissioner was "considering whether to propose under the provisions of [current 21 C.F.R. § 570.38] to determine that [various VKAS] are not GRAS and are food additives subject to ... 21 U.S.C. 348." The notice further stated that the Commissioner would receive, for 60 days, comments concerning VKAS. After discussing the history of VKAS, the notice concluded as follows:

> The Commissioner will evaluate all comments received. If it is concluded that there is convincing evidence that the [VKAS] are GRAS, a regulation will be published affirming the substances as GRAS. If there is a lack of convincing evidence that the substances are GRAS, a notice will be published that such substances are food additives as defined in [21 U.S.C. § 321(s)].

> If he determines that the substances are food additives, the Commissioner may: (1) Promulgate a food additive regulation governing use of the additive; or (2) promulgate an interim food additive regulation governing use of the additive; or (3) require discontinuation of the additive; or (4) adopt any combination of the above approaches.

41 Fed.Reg. 35009 (August 18, 1976).

Over the course of the next seven years, the FDA considered Heterochemical's petition and the 47 public submissions received in response to the '76 Notice. The administrative record compiled as a result comprised six volumes, and details information, in the form of scientific studies and other documents, received from manufacturers, nutritionists, and the U.S. Department of the Interior.

On April 19, 1983, the FDA published another notice (the " '83 Notice") which reported the results of its study. The notice reported, *inter alia,* that the evidence studied was not sufficient to allow the FDA to classify VKAS as GRAS. The notice also stated, however, that "VKAS have been added to animal food for more than 30 years, without apparent animal or human safety problems," and that therefore "[t]he Agency does not plan to propose the issuance of food additive or GRAS affirmation regulations for VKAS at the present time" and "denies Heterochemical's petition." 48 Fed.Reg. 16748 (April 19, 1983).

Heterochemical brought suit to compel the FDA to take further steps, as the FDA is authorized to do under 21 C.F.R. § 570.38. FDA's motion to dismiss this action on the grounds that its decision not to act was unreviewable was denied, 644 F.Supp. 271 (E.D.N.Y.1986). The parties thereafter moved and cross-moved for summary judgment.

II. *Standard of Review*

■ The FDA renews its argument that its decision not to take any action beyond the publication of the '83 Notice is completely unreviewable. In support of this proposition, it cites *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), and *Community Nutrition Institute v. Young,* 818 F.2d 943 (D.C.Cir.1987). Both of these cases clearly hold that a decision by the FDA not to initiate "enforcement proceedings" as provided by the FDCA is completely within its discretion, and is not subject to judicial review. Both of these decisions, however, rely on the fact that the "enforcement proceedings" sought by the plaintiffs were those that the FDCA merely authorizes or allows[2], but does not require. *See, Chaney,* 470 U.S. at 835, 105 S.Ct. at 1657, *Community Nutrition,* 818 F.2d at 949–50. These cases, therefore, stand only for the proposition

---

**2.** The *Chaney* court cited 21 U.S.C. §§ 332, 335, 334 & 372. 470 U.S. at 835, 105 S.Ct. at 1657.

The *Community Nutrition* court cited 21 U.S.C. § 336. 818 F.2d at 950.

that a decision by the FDA not to initiate a *discretionary* enforcement proceeding is unreviewable. They do not hold that the FDA may refuse to take any *mandatory* enforcement steps prescribed by statute or regulation. As the Supreme Court said in *Chaney*, "agencies [are not] free to disregard legislative direction in the statutory scheme that the agency administers." 470 U.S. at 833, 105 S.Ct. at 1656. In fact, the FDA does not dispute that agencies are obliged to follow their own regulations. *See, Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

■ The only issue before the court, then, is whether the actions Heterochemical seeks to compel are mandated by statute or regulation. All Heterochemical currently seeks from the FDA is that it, by notice published in the Federal Register, either 1) promulgate a food additive regulation governing use of the VKAS studied, 2) promulgate an interim food additive regulation governing their use, 3) require discontinuation of their use, or 4) adopt any combination of these approaches for different uses or levels of use of the VKAS studied. Heterochemical claims that this action is mandated by 21 C.F.R. § 570.38. If this contention is correct, this court may order the FDA to comply with such mandate. *See, American Public Health Assoc. v. Veneman,* 349 F.Supp. 1311 (D.D.C.1972); *Hoffmann–LaRoche, Inc. v. Weinberger,* 425 F.Supp. 890 (D.D.C.1975). The discussion below is therefore concerned only with the question of whether 21 C.F.R. § 570.38 requires the FDA to take the steps requested by Heterochemical.

## III. *Discussion*

21 C.F.R. § 570.38(b)(1) provides, in relevant part, that

> The Commissioner, ... on the petition of any interested person, ... may issue a notice in the Federal Register proposing to determine that a substance is not

GRAS and is a food additive subject to [21 U.S.C. § 348]."

The word "may" in this regulation clearly indicates that the decision whether to issue such a notice is discretionary.

Subsection (2) of this regulation provides that, if such a notice is published, it will allow 60 days for public comment. Subsection (3) provides, in relevant part, as follows:

> The Commissioner will evaluate all comments received. If he concludes that there is a lack of convincing evidence that the substance is GRAS or is otherwise exempt from the definition of a food additive in [21 U.S.C. § 321(s)], he will publish a notice thereof in the Federal Register.

The word "will" in this subsection clearly indicates that if the Commissioner chooses to commence the procedure described in (b)(1), he must publish the notice described above upon a finding that sufficient evidence has not been produced to determine that the substance studied is GRAS or otherwise exempt from 21 U.S.C. § 321(s). 21 C.F.R. § 570.38(c) provides that:

> A Federal Register notice determining that a substance is a food additive shall provide for the use of the additive in food or food-contact surfaces as follows: (1) It may promulgate a food additive regulation governing use of the additive. (2) It may promulgate an interim food additive regulation governing use of the additive. (3) It may require discontinuation of the use of the additive. (4) It may adopt any combination of the above three approaches for different uses or levels of use of the additive.

The word "shall" in this subsection clearly indicates that if the Commissioner publishes such a notice, it must provide for one of the four listed alternatives. The word "may" in (1)–(4) would thereby merely indicate that the Commissioner retained discretion as to which of the four approaches to pursue.

Read together, the above subsections provide the Commissioner with discretion to initiate the (b)(1) procedure, but require certain actions if such procedure is com-

menced. These actions are precisely those sought by Heterochemical. Therefore, the crucial question is whether the (b)(1) procedure was ever initiated. This, in turn, depends upon whether the '76 notice was a (b)(1) notice. Heterochemical asserts that it was, and the FDA argues that it was not. In the final analysis, this is the only dispute between the parties.[3]

The starting point for any consideration of this question must be the Notice itself. Unfortunately, the language of the Notice is contradictory. The first paragraph says that the Commissioner is merely *"considering whether to propose to determine"* (emphasis added) the food additive status of the VKAS; (b)(1) requires an actual proposal to determine. On the other hand, the penultimate and antepenultimate paragraphs (quoted *supra*) trace the language of 21 C.F.R. § 570.38(b)(3) and (c) practically word for word, suggesting that the Notice was an actual proposal. The only material difference between the language of those paragraphs and the Regulation is the substitution of the phrase "[i]f he determines that the substances are food additives the Commissioner may" for the phrase "[a] Federal Register notice determining that a substance is a food additive shall provide ... as follows" before the list of four alternatives. It is unclear, however, that the use of the word "may" in the Notice was not intended merely to allow its slightly different wording to read smoothly. The Regulation prefaces each of the alternatives with the word "may," the Notice places that word before the list of alternatives. In both cases, the most reasonable construction is that the word "may" refers merely to the Commissioner's discretion to select among the alternatives,

not to his discretion to implement none of them.

Any doubt as to the soundness of this reading is completely eliminated by the fact that, were this not a (b)(1) notice, the Commissioner would not have had even discretionary authority to implement any of the four alternatives. The FDA itself argues that the actions sought by Heterochemical cannot lawfully be taken unless the subdivision (b) procedure has been commenced and carried through. Def Mem. at 29–30. The Agency here attempts to argue, however, that the '76 Notice was not a (b)(1) notice, and yet gave the Commissioner discretionary authority to implement one of the four alternatives in subsection (c). The Agency cannot have it both ways. The only possible reading of the language of the Notice, therefore, is that the Commissioner intended the notice to be a (b)(1) notice, which would bind him to implement one of the four alternatives if the VKAS were not shown to be GRAS. Even if this was not the Commissioner's actual intent, it is the only logical reading of the Notice made public by the FDA.[4]

This conclusion is further supported by the actions of the FDA when considered as a whole. The FDA 1) published a notice in the Federal Register, by which it 2) solicited comments for 60 days, 3) evaluated the comments, and 4) concluded that the substances studied were not proven GRAS or prior-sanctioned. This is precisely the procedure for determination of food additive status under 21 C.F.R. § 570.38. In essence, the FDA asks this court to ignore all of its actions and words in determining whether it initiated the (b)(1) procedure,

3. The FDA also argues that even if the '76 notice was a (b)(1) notice, it is not required to take any of the steps prescribed by subsection (c). Since this flies in the face of the clear language of the regulation, this argument must be rejected.

4. The FDA suggests in its brief that the confusion engendered by these paragraphs was resolved when the FDA told certain representatives of Abbott Laboratories "that it was our intention to issue a proposal after the comments had been received and evaluated." Def. Mem. at 25 n. 20; R. 1420. Putting aside the discrepancy between that statement and the Agency's

actions, it would be absurd to allow the language of a public notice to be modified by statements made in private meetings, and not made public until eleven years later (in fact, Heterochemical has submitted an affidavit to the effect that the minutes of this meeting have *never* been placed on the public docket maintained by the FDA, *see,* Lapointe Affidavit). Indeed, this meeting merely reinforces the court's reading of the '76 Notice, since it indicates that Abott Laboratories, upon reading the Notice, thought it was a (b)(1) notice.

based upon the two words "considering whether" in the '76 Notice. These words are too frail to shoulder such a great burden.

Two additional arguments of the FDA must be considered. First, the FDA claims that it will require a great expenditure of Agency resources to comply with Heterochemical's petition, since it would require soliciting and evaluating comments all over again. Second, the Agency contends that, even were it empowered to act on the current record, it should not rely upon evidence as outdated as that in the administrative record of this case, which is now 13 years old.

The first argument is specious. All the FDA will be required to do pursuant to this order is publish a notice in the Federal Register that complies with 21 C.F.R. § 570.38(b). It will not be necessary, as the Agency suggests, to initiate and carry through the (b)(1) procedure, since this court today holds that this has already been done. The FDA admits that "[f]rom [its] findings, it would be fair to conclude that it would constitute a violation of the FDC Act to market in interstate commerce any VKAS other than" in the manner and for the uses which Heterochemical has already asserted to be prior-sanctioned or regulated. Def. Mem. at 6. It is not too much to ask the Agency to tell this to the public, and regulate or discontinue sale of these substances, as required by 21 C.F.R. § 570.38.

The second argument is disingenuous. If the evidence in this case is stale, it can only be attributed to the Agency's actions. In any event, this argument misconstrues the relative burdens that the FDCA places on those who would market food substances. Under the Act, a party wishing to market a food substance has the burden of establishing that the substance is safe. 21 U.S.C. §§ 301, 321(s), 331, 342, 348(a). If the evidence in the administrative record "lacks the quantity and quality of data" (48 Fed.Reg. at 16750) necessary to establish the substances as safe, the fact that this evidence is stale does not change the fact that this burden has not been met. If

evidence developed recently demonstrates that the VKAS in question are safe, those who wish to market them may petition the FDA to have them declared GRAS.

For the reasons stated above, Heterochemical's motion for summary judgment is granted, to the extent that it requires the FDA to publish a proper notice under 21 C.F.R. § 570.38. Such notice must, as required by that regulation, provide for use of the VKAS in question in accordance with one of the four alternatives in § 570.38(c).

SO ORDERED.