LOCAL 1219, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al.

v.

Raymond J. DONOVAN, Secretary of Labor, et al., Appellants.

LOCAL 1219, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al.

v.

Raymond J. DONOVAN, Secretary of Labor, et al. American Federation of Government Employees, AFL–CIO, Appellant.

Nos. 81–2284, 81–2288.

United States Court of Appeals, District of Columbia Circuit.

Argued June 7, 1982.

Decided July 13, 1982.

As Amended Aug. 12, 1982.

See also, D.C., 516 F.Supp. 1362.

Jason D. Kogan, Asst. U. S. Atty., with whom Stanley S. Harris, U. S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U. S. Attys., Washington, D. C., were on the brief, for Donovan, et al., appellants in No. 81–2284.

James R. Rosa with whom William J. Stone and Michael T. Leibig, Washington, D. C., were on the brief, for American Federation of Government Employees, in No. 81–2288.

Edward L. Merrigan, Washington, D. C., for appellees, Local 1219.

Before ROBINSON, Chief Judge, and TAMM and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case presents a difficult question of first impression regarding the judiciary's authority to review settlement agreements between the Department of Labor ("Department") and a federal employees' union resolving charges of unfair election procedures. Although it is well established that the Department's enforcement of analogous

private sector laws is subject to some judicial scrutiny, we have not previously examined the judicial role in reviewing enforcement of standards governing public sector labor organizations. In this case, we hold that the Department's decision to enter a settlement agreement is subject to limited review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). We disagree, however, with the district court's conclusion that the Department acted arbitrarily by entering the settlement agreement challenged here. We therefore reverse and remand.

## I. BACKGROUND

At the American Federation of Government Employee's ("AFGE") August, 1980 election, incumbent Kenneth Blaylock narrowly defeated Carl Sadler for the office of national president. The election results were contested immediately, and, as a result, the convention instructed the AFGE's Election Committee to investigate charges of election irregularities. The Election Committee returned a month later with a report recommending that the AFGE's National Executive Council consider a run-off election. The incumbent leadership, however, concluded that the Committee's report confirmed the legitimacy of the election results, and therefore that there was no need for the National Executive Council to meet. Accordingly it advised Sadler that there would be no run-off election.

Having exhausted their internal union remedies, Sadler and two other union members filed a complaint with the Department of Labor charging that the AFGE's election was conducted in violation of section 7120 of the Civil Service Reform Act of 1978 [1] ("CSRA"), which governs the conduct of public employee elections, and applicable regulations.[2] On March 4, 1981, the Director of the Office of Labor-Management Standards ("Director") notified Blaylock that there was probable cause to conclude that the AFGE's election had been conducted illegally.[3] Pursuant to the Department's regulations, he invited Blaylock to negotiate a settlement for "appropriate remedial action." Absent such a settlement, he explained, the Department would institute administrative enforcement proceedings. 29 C.F.R. § 208.66.[4]

Two months later, the Director and the AFGE entered into a settlement agreement.[5] Under the terms of this agreement, the Department is to supervise the August, 1982 election of four national officers.[6] In addition, the agreement authorized the De-

1. Pub.L.No.454, 95th Cong., 2d Sess. (1978), 5 U.S.C. § 7120.

2. Section 7120(d) provides that the "Assistant Secretary [of Labor for Labor-Management Relations] shall prescribe such regulations as are necessary to carry out the purposes of this section [entitled "Standards of conduct for labor organizations"]. Such regulations shall conform generally to the principles applied to labor organizations in the private sector." Pursuant to this statutory directive, the Assistant Secretary promulgated 29 C.F.R. § 208.29 (1980), which provides:

Every labor organization subject to the Act shall conduct periodic elections of officers in a fair and democratic manner. All elections of officers shall be governed by the standards prescribed in sections 401(a), (b), (c), (d), (e), (f), and (g) of the [Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 481(a)-(g)] to the extent that such standards are relevant to elections held pursuant to the provisions of 5 U.S.C. § 7120.

Sadler alleged that the AFGE had impeded his distribution of literature and had discriminated against him in the use of membership

lists. In addition he charged that Blaylock had permitted paid staff employees from the national headquarters to interfere with voting delegates and had improperly appointed the incumbent AFGE Secretary-Treasurer to chair the Credentials Committee.

3. See Letter from Richard Hunsucker, Director, to Kenneth Blaylock, National President of the AFGE (Mar. 4, 1981), Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue, Exhibit B; Appendix ("App.") 125.

4. Id.; App. 127.

5. Plaintiffs' Statement Of Material Facts As To Which There Is No Genuine Issue, Exhibit D; App. 130.

6. The Department will supervise elections for the offices of National President, Executive Vice President, National Secretary-Treasurer, and Director of the Women's Affairs Department. Id.; App. 131.

partment to supervise the election of the delegates to the August, 1982 convention. In return, the Department agreed not to institute administrative enforcement proceedings so long as the AFGE complied with the terms of the agreement.[7]

Protesting that this settlement agreement in fact provided no remedial relief, four locals of the AFGE and eighty six individual members brought this action in the United States District Court seeking to require the Director to comply with the terms of 29 C.F.R. § 208.66. Plaintiffs argued that once the Director has made a finding of probable cause, and the abusive union has requested a conference with the Director, the Director's discretion is circumscribed by 29 C.F.R. § 208.66, which provides:

At any such conference, the Director may enter into an agreement providing for *appropriate remedial action.* If no person or labor organization requests such a conference, or upon failure to reach agreement following any such conference, the Director *shall institute enforcement proceedings* by filing a complaint with the Chief Administrative Law Judge, U. S. Department of Labor.

29 C.F.R. § 208.66 (emphasis added). Since in their view the Director's settlement failed to provide appropriate remedial action, they sought an order requiring the Director to renegotiate the agreement or bring an administrative enforcement proceeding against the union.

7. *Id.*; App. 132.

8. *Local 1219, American Federation of Government Employees v. Donovan*, 516 F.Supp. 1362 (D.D.C.1981); App. 48–49.

9. App. 81–82.

10. *Local 1219, American Federation of Government Employees v. Donovan*, Civ. Action No. 81–1385 (D.D.C. Oct. 9, 1981); App. 262.

11. Appellees originally moved to dismiss on the ground that there was no judgment below. On March 29, we remanded to the district court for a clarification of its order. On March 31, 1982, the district court entered an order making it clear that its prior order is appealable. *See*

In an opinion issued on July 8, 1981, the district court concluded that the settlement agreement did not provide "appropriate remedial action" and therefore instructed the Director to proceed with negotiations or an enforcement action as required by 29 C.F.R. § 208.66.[8] A motions panel of this court vacated the district court's order and, without determining whether the Director's actions were reviewable, remanded this case to the district court with instructions to obtain a Statement of Reasons for the Director's decision.[9] After obtaining and reviewing such a statement, the district court concluded that the Director had acted outside his scope of discretion on the theory that a supervised 1982 election was not a proper remedy for an illegal 1980 election.[10] The court therefore ordered the Director, once again, to proceed in accordance with his obligations under 29 C.F.R. § 208.66. This appeal followed.[11]

## II. REVIEWABILITY OF THE DEPARTMENT'S DECISION

At the outset, the government challenges our jurisdiction to review the Department's decision that the settlement agreement with the AFGE constitutes "appropriate remedial action." 29 C.F.R. 208.66.[12] As no specific statute authorizes judicial review of such determinations, resolution of this challenge turns on the availability of review under the APA. In particular, we must assess whether settling a complaint of union election irregularities is "agency action committed to agency discretion by law," and is thus unreviewable under the APA. 5 U.S.C. § 701(a)(2).

*Local 1219, American Federation of Government Employees*, Civ. Action No. 81–1385 (D.D.C. Mar. 31, 1982), *reprinted in* Supplemental Brief for AFGE, Addendum B.

12. AFGE raises the additional point that the dissident members did not exhaust their administrative remedies by appealing the Director's decision to "in effect" dismiss their complaint. *See* 29 C.F.R. § 208.64. Under the terms of the settlement, however, the Director did not "dismiss" the complaint, but instead reserved the right to institute enforcement proceedings if the agreement was violated. The regulation cited by the AFGE is therefore inapposite.

The APA's exception for "agency action committed to agency discretion" is a "very narrow exception . . . applicable in those rare instances when 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting S.Rep.No.752, 79th Cong., 1st Sess. 26 (1945)). Indeed, because the APA authorizes courts to set aside agency action that constitutes an abuse of discretion, *see* 5 U.S.C. § 706(2)(A), the existence of agency discretion, in itself, hardly constitutes grounds for concluding that agency action is unreviewable. *See* K. DAVIS, ADMINISTRATIVE LAW TREATISE § 28.16 (1982 Supp.). Instead, the APA's exception for "agency action committed to agency discretion" shields from review only those matters for which "a fair appraisal of the legislative scheme, including a weighing of practical and policy implications of reviewability, persuasively indicates that judicial review should be circumscribed." *Local 2855, American Federation of Government Employees (AFL–CIO) v. United States*, 602 F.2d 574, 578 (3d Cir. 1979). *Accord Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1043 (D.C.Cir.1979) ("In practice the determination whether there is 'law' to apply necessarily turns on pragmatic considerations as to whether an agency determination is the proper subject of judicial review."). Only when "the considerations in favor of nonreviewability . . . are sufficiently compelling to rebut the strong presumption of judicial review" will we conclude that judicial review is foreclosed. *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d at 1044.

The government argues that there is "no law to apply" in this case because the CSRA, 5 U.S.C. § 7120(d), allows the Assistant Secretary of Labor Management Relations ("Assistant Secretary") to provide remedies "as he considers appropriate." Since this language does not specify when the Assistant Secretary must provide a remedy, the government concludes that it leaves the Assistant Secretary with unfettered discretion. Government's Brief at 16.

The government's interpretation of section 7120(d) ignores the full language of that section and its implementing regulations. In section 7120 Congress directed that "[a]n agency *shall* only accord recognition to a labor organization that is free from corrupt influences" (emphasis added) and that the Assistant Secretary "*shall* prescribe such regulations as are necessary to carry out the purpose of this section." (Emphasis added). Pursuant to his statutory obligation, the Assistant Secretary promulgated regulations setting forth specific standards for labor organizations and a detailed scheme for enforcing compliance with those standards.[13] These regulations provide that whenever the Director of the Office of Labor Management Standards Enforcement finds probable cause to believe that a violation of election standards has occurred, he must institute an enforcement action unless he has arrived at a settlement that provides "appropriate remedial action." 29 C.F.R. § 208.66.[14] This regulatory scheme does not contemplate that the Director shall have complete discretion to decide whether relief is appropriate for "probable" violations. Instead, it provides the Director with flexibility to pursue remedies for "probabl[y]" illegal elections through either settlement or enforcement proceed-

---

**13.** These regulations set forth virtually the identical enforcement scheme for violations of the CSRA's union democracy provisions as apply to violations of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 482 ("LMRDA"). This parallel structure is hardly coincidental since section 7120(d) directs the Assistant Secretary to adopt regulations that generally conform to principles applied to private sector labor organizations. The only significant difference between the regulations pro-

mulgated under the CSRA and the LMRDA's statutory enforcement scheme is the forum selected for enforcement. Under the LMRDA, enforcement proceedings are to be instituted in district court. *See* 29 U.S.C. § 482(b). The parallel CSRA regulation provides for enforcement in administrative proceedings before an Administrative Law Judge. *See* 29 C.F.R. § 208.66.

**14.** *See* page 514 *supra*.

ings, and to adjust his remedial demands as the circumstances warrant.[15] Having promulgated these regulations pursuant to section 7120(d)'s directive, the Assistant Secretary must abide by them. *See generally Service v. Dulles*, 354 U.S. 363, 373, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957); *Nader v. NRC*, 513 F.2d 1045, 1051 (D.C.Cir.1975). *See also United States v. Caceres*, 440 U.S. 741, 753–54, 99 S.Ct. 1465, 1472, 59 L.Ed.2d 733 (1979) (discussing APA review of agency action taken in disregard of agency regulations).[16]

■ The government suggests that judicial review is nonetheless inappropriate because settlement negotiations involve special matters of agency expertise. It suggests that courts are ill-suited to assess the impact of a settlement on a union, its suitability under agency policy or the wisdom of devoting agency resources to an enforcement proceeding. Government's Brief at 11. Because the Director has considerable experience in these matters, they conclude, the question of whether, and on what terms, to settle should be left entirely to his discretion.

We do not doubt the experience and expertise of the Director; but we cannot agree that it forecloses judicial review. Far from lacking any experience with reviewing settlement agreements, courts are well acquainted with the task of approving settlements of enormous complexity. *See, e.g.*, 15 U.S.C. § 16(e), (f) (requiring judicial approval of antitrust settlements to assess whether they are in the public interest); FED.R.CIV.P. 23(e) (requiring judicial approval of class action settlements). Moreover, the judicial review sought in this case would not require courts to probe deeply into the substance of a settlement. Instead, we are asked solely to assess whether the Director's decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This limited determination is one which courts are well-equipped to make. *Cf. City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 454 (2d Cir. 1974) (reviewing district court's approval of a settlement for an abuse of discretion); *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971) (same). Finally, courts are especially suited to the task of assuring that the interests of those not party to negotiations have been adequately protected. In a case such as this, in which the protesting locals have not been involved in negotiations with the "probabl[y]" abusive union, some judicial oversight is appropriate. *Cf. Dunlop v. Bachowski*, 421 U.S. 560, 568, 95 S.Ct. 1851, 1858, 44 L.Ed.2d 377 (1975) (permitting review of Department's decision that civil enforcement is not warranted).[17]

**15.** Indeed, the Director's letter to Kenneth Blaylock setting forth the reasons for his probable cause finding clearly interprets the applicable regulations to require an enforcement proceeding in the absence of an agreement providing appropriate remedial action. *See* Letter from Richard Hunsucker, Director, to Kenneth Blaylock, AFGE National President (Mar. 4, 1981); App. 127. The Director's obligation to obtain appropriate remedial action, of course, hinges on his probable cause determination. Since there was such a determination in this case, we need not assess whether the Director's probable cause determinations are themselves reviewable. This latter question has been answered affirmatively in the context of the LMRDA. *See Dunlop v. Bachowski*, 421 U.S. 560, 571, 95 S.Ct. 1851, 1859, 44 L.Ed.2d 377 (1975).

**16.** Even assuming, *arguendo*, that section 7120(d) was drafted in permissive terms, we could not agree that permissive language would offer conclusive evidence of congressional in-

tent to preclude review. As a general matter, permissive statutory language only affects the scope of an agency's discretion; it does not constitute a license to undertake actions that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See, e.g., Fleming v. FTC*, 670 F.2d 311, 316 n.15 (D.C.Cir.1982).

**17.** In this connection, the comments of the Third Circuit in *Bachowski v. Brennan*, 502 F.2d 79 (3d Cir. 1974), expressly approved by the Supreme Court on review, *see Dunlop v. Bachowski*, 421 U.S. at 567 n.7, 95 S.Ct. at 1858 n.7, are pertinent:

[T]he legislative history of the LMRDA demonstrates a deep concern with the interest of the individual union member, as well as the general public, in the integrity of union elections. Thus, in seeking to remedy violations of the Act, the Secretary acts not only for the benefit of the country as a whole, but also on behalf of those individuals whose rights have

We would nonetheless refrain from review if the legislative history of the CSRA persuasively indicated Congress' intent to preclude any judicial role. In conducting an inquiry into congressional intent, however, we must be mindful of the strong presumption against concluding that Congress meant to prohibit any judicial oversight of agency action. As the Supreme Court recently reminded:

> "The question is phrased in terms of 'prohibition' rather than 'authorization' because a survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 [87 S.Ct. 1507, 1510, 18 L.Ed.2d 681] (1967). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Id.*, at 141 [87 S.Ct. at 1511]. See also *Rusk v. Cort*, 369 U.S. 367, 379–380 [82 S.Ct. 787, 794, 7 L.Ed.2d 809] (1962); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 [91 S.Ct. 814, 820, 28 L.Ed.2d 136] (1971).

*Dunlop v. Bachowski*, 421 U.S. at 567, 95 S.Ct. at 1857. On examination of the legislative history of the CSRA we conclude that this history is too ambiguous on the question of judicial review to overcome the strong presumption in favor of judicial oversight.

As the government correctly points out, neither the House nor the Senate-passed versions of the CSRA expressly provided for judicial review of decisions concerning enforcement of their respective counterparts of section 7120. See S. 2640, 95th Cong., 2d Sess. §§ 7204(c)(3), 7204(1), 7217 (1978), *reprinted in* SUBCOMMITTEE ON POSTAL PERSONNEL AND MODERNIZATION OF THE HOUSE COMMITTEE ON POST OFFICE AND CIVIL SERVICE, 96TH CONG., 1ST SESS., LEGISLATIVE HISTORY OF THE FEDERAL SERVICE LABOR-MANAGEMENT RELATIONS STATUTE, TITLE VII OF THE CIVIL SERVICE REFORM ACT OF 1978, at 567, 571, 586–588 (Comm. Print 1979) [hereinafter cited as LEGISLATIVE HISTORY]; H.R. 11280, 95th Cong., 2d Sess. §§ 7120, 7123 (1978), *reprinted in* LEGISLATIVE HISTORY, at 978–79. At the same time, however, neither bill gave the Department of Labor unreviewable discretion to supervise enforcement of the bill's standards of conduct for labor organizations. The Senate bill provided that the decisions of the Assistant Secretary could be reviewed by the Federal Labor Relations Authority ("FLRA"), an independent agency entrusted with enforcement of much of the bill's labor relations provisions. See S. 2640, 95th Cong., 2d Sess. § 7204(c)(3), *reprinted in* LEGISLATIVE HISTORY, at 567. The House bill did not specify any mechanism for enforcing standards governing labor organizations, apparently leaving complete enforcement responsibility with the FLRA. Thus, while neither House expressly contemplated review by the judiciary, both ensured that an independent agency would scrutinize complaints of election irregularities.

In conference, enforcement of section 7120 was delegated to the Assistant Secretary, in accordance with the Senate bill, in an apparent attempt to take advantage of the Assistant Secretary's expertise in developing and enforcing similar standards in the private sector. See S.Rep.No.969, 95th Cong., 2d Sess. 100 (1978), U.S.Code Cong. & Admin.News 1978, p. 2723, *reprinted in* LEGISLATIVE HISTORY, at 760. The conference report offered no explanation, however, for omitting the Senate bill's provisions allowing for oversight by the FLRA. See H.R.Rep.No.1717, 95th Cong., 2d Sess. 152–59, *reprinted in* LEGISLATIVE HISTORY, at 820–27.

The government suggests that this legislative history indicates a legislative intent to preclude judicial review. While we agree that this reading is plausible, we do not find it the reading most consonant with

been infringed. To grant the Secretary absolute discretion in this situation seems particularly inappropriate, for if he wrongfully

refuses to file suit, individual union members are left without a remedy.
502 F.2d at 87–88.

congressional purposes, or the general statutory scheme, and it does not rise to the level of "clear and convincing evidence" of congressional intent needed to preclude judicial review. Preliminarily, we note that the government has not pointed to any special legislative intent regarding the particular issue before us—namely the judiciary's authority to review decisions to enter settlement agreements. Thus, the government's argument amounts to an attack on the judiciary's ability to review *any* of the Assistant Secretary's actions taken pursuant to section 7120. Should we accept the government's argument, we would therefore be recognizing an unchallengeable authority in the Assistant Secretary to monitor violations, investigate charges and impose sanctions. No desire to impart such a far reaching immunity is evident in the legislative history the government relies on. The judicial review provisions of both the House and Senate bills focused solely on the question of judicial review of the FLRA's decisions;[18] thus it was only because these bills gave the FLRA some responsibility over enforcement of section 7120 that they spoke to the question of whether the judiciary should oversee such enforcement decisions. But when Congress shifted responsibility away from the FLRA and to the Assistant Secretary, Congress took the CSRA's provisions for labor organization standards out of the general enforcement scheme of the CSRA and placed them within the enforcement scheme of analogous private sector laws. Although the public and private sector laws are not one and the same, this legislative history indicates that Congress may well have contemplated that the Assistant Secretary's decisions regarding public sector unions would be reviewable along with his decisions regarding private sector unions. *See Dunlop v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). Absent any more explicit indication that the Assistant Secretary's decisions should be free from any judicial scrutiny, we cannot conclude that Congress clearly intended to prohibit review.

### III. VALIDITY OF THE DEPARTMENT'S DECISION

■ On the merits, the standard by which we review the Department's decision is quite narrow. We cannot substitute our judgment for that of the Director, in whom the Department entrusted the decision to enter into settlement agreements. Rather, we must restrict our inquiry to determining whether his actions violated applicable statutory or regulatory provisions, or demonstrate that he acted arbitrarily, capriciously or otherwise in abuse of his discretion.

■ The Director's Statement of Reasons for settling with the AFGE present ample grounds for upholding his decision. In his statement, the Director outlined a number of possible impediments to an administrative enforcement action and explained how the relief obtained through settlement—supervision of the next regularly scheduled election—was for all practical purposes the same as that which could be obtained through an enforcement action. Rather than evidencing an abdication of the Director's responsibility to obtain "appropriate remedial action," the Statement of Reasons indicates a careful consideration of the practical consequences of pursuing alternative remedial approaches.

The underlying theme in the Director's Statement of Reasons is that the settlement offered certainty of relief.[19] In this connection, the Director pointed to four possible weaknesses in his case against the union. First, some members of organizations affiliated with the AFGE were employed by the private sector. In the Director's opinion, this fact indicated that the AFGE's elections would be covered by both the LMRDA and the CSRA, and therefore raised the

---

**18.** *See* S. 2640, 95th Cong., 2d Sess. § 7204(e) (1979), *reprinted in* LEGISLATIVE HISTORY, at 571; H.R. 11280, 95th Cong., 2d Sess. § 7123 (1978), *reprinted in* LEGISLATIVE HISTORY, at 979.

**19.** *See* Statement of Reasons for Entering Into an Agreement on May 20, 1981 to Supervise the 1982 Election of National Officers of the American Federation of Government Employees 3; App. 88.

question whether relief under the LMRDA was the exclusive remedy. Were the LMRDA to be the exclusive remedy, he noted, the union would be able to successfully defend any action on the ground that the Director's enforcement actions were not timely. Second, the Director expressed concern that the original complaints filed against the AFGE were "couched in vague language" raising the possibility that the Director's case would be dismissed for being outside the scope of the complaining member's allegations.[20] Third, the Director suggested that a factfinder may not be sympathetic to the government's case inasmuch as the violations were not willful or fraudulent. Finally, the Director noted that he might not be able to prove that the violations affected the election's outcome.[21]

In addition to the certainty provided by the settlement, the major factor counseling against an enforcement action was the practical equivalence of a supervised 1982 election and a supervised re-run of the 1980 election. The Director explained that supervised elections following an enforcement action probably could not be completed before the regularly scheduled August, 1982 election.[22] Through the settlement agreement, however, a supervised 1982 election was assured, and supervision of the election of delegates could begin in the fall of 1981. Thus, while there would not be a re-running

of the August, 1980 election, the settlement provided what the Director considered to be a more expeditious route to a supervised national election.

The district court found the Director's reasons inadequate because "the government does nothing to remedy the violations that may have occurred in 1980, nor does it grant plaintiffs any prospective rights other than those to which they are already entitled." *Local 1219, American Federation of Government Employees v. Donovan,* Civ.Action No. 81–1385 (D.D.C. Oct. 9, 1981); Appendix 262. We disagree. Rather than failing to give aggrieved union members any prospective rights, the settlement provides the essential remedy for an illegal election, namely, a supervised future election.[23] Indeed, according to the Director's estimates, the settlement provides an earlier supervised election than could have been achieved through an enforcement action. Under these circumstances, we find the Director's decision to be amply supported.[24]

## CONCLUSION

The APA provides courts with limited authority to review the Department's enforcement of labor management standards of conduct. Applying the APA's standards to this case, we conclude that the Department acted reasonably in entering into a settlement agreement with the AFGE. We

---

**20.** *Id.* at 4; App. 89.

**21.** The Director noted that this investigation had disclosed violations affecting 32,000 votes. Since the margin in the National Secretary-Treasurer election was approximately 39,396 votes, the Director suggested that he might not be able to prove that the violations affected the outcome of the election.

In the Director's opinion, he could only carry this part of his case if the Administrative Law Judge were to accept the analysis of *Marshall v. South Atlantic & Gulf Coast Dist., International Longshoremen's Ass'n,* 97 L.R.R.M. (BNA) 2501 (S.D.Tex.1978) (pervasive violations in a portion of the locals may raise an inference of similar, undiscovered violations sufficient to affect an election's outcome).

**22.** *Id.* at 7; App. 92.

**23.** Appellees cite *Wirtz v. Local 153, Glass Bottle Blowers Ass'n,* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968) for the proposition that a

1982 election cannot remedy an illegal 1980 election. *See* Appellees' Brief at 40–42. *Wirtz,* however, only holds that an intervening election does not moot a challenge to a prior illegal election. It does not suggest that a *supervised* regularly scheduled election is an inappropriate remedy for a prior illegal election.

**24.** We do not suggest that a supervised future election provides precisely the *same* relief as a rerun of the allegedly illegal election. *Cf. Brennan v. Connecticut State UAW Community Action Council,* 373 F.Supp. 286, 288 (D.Conn.1974) (supervised future election is an insufficient remedy under the LMRDA). We hold only that the Secretary has not acted arbitrarily and capriciously by determining that, under the circumstances of this case, a supervised future election constitutes "appropriate remedial action" within the meaning of his own regulations. 29 C.F.R. § 208.66.

therefore reverse the judgment of the district court and remand with instructions to grant defendant's motion for summary judgment.

*So ordered.*