Guerino R. DeROSA, R. David Duncan, Lillian Langlie, and Opportunities For Broome, Inc., Appellants,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; Samuel Pierce, in his official capacity as Secretary of the United States Department of Housing and Urban Development; Joseph Lynch, in his official capacity as Area Manager of the Buffalo Area Office of the United States Department of Housing and Urban Development; City of Binghamton, a municipal corporation; and Juanita M. Crabb, in her official capacity as Mayor of the City of Binghamton, Appellees.

No. 632, Docket 85–6304.

United States Court of Appeals,
Second Circuit.

Argued Dec. 19, 1985.

Decided April 11, 1986.

James C. Gocker, Harris, Beach, Wilcox, Rubin & Levey, Rochester, N.Y. (James M. Quinn, on brief), for appellants.

David Deutsch, Trial Atty. Dept. of Housing and Urban Development, Washington, D.C. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Rosemary Roberts, Asst. U.S. Atty., Gershon M. Ratner, Associate General Counsel for Litigation, and Carolyn B. Lieberman, Asst. General Counsel for Litigation, of counsel), for Federal appellees.

Kenneth Auerbach, Corp. Counsel, Binghamton, N.Y., for appellee City of Binghamton.

Before OAKES, KEARSE and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

A hotel of over 200 rooms, to be operated under a Sheraton franchise, is being built in Binghamton, New York (City), by a private developer with $1.8 million of private equity investment and with the assistance of $3.3 million granted by the federal government to the City on the $12.4 million project. The grant to the City was made under the Urban Development Action Grant (UDAG) program, 42 U.S.C. § 5318 (1982); 24 C.F.R. §§ 570.450–570.466 (1982),[1] and was in turn loaned by the City to the private developer. Also involved is a $7.3 million federal loan guarantee to the City under the Community Development Block Grant (CDBG) program authorized under Section 108 of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. § 5308 (1982); 24 C.F.R. §§ 570.700–570.705 (1982). Under section 108 and the corresponding regulations, the Federal Financing Bank loans funds to a municipality and the United States Department of Housing and Urban Development (HUD) guarantees that repayment will be made. The developer obtained from a local bank $7.3 million in construction financing and personally guaranteed repayment. Initially, the plan called for the City to purchase the hotel from the developer and convey it back to the same developer, taking back a purchase money mortgage, but as the project evolved the City is to purchase the completed hotel and lease it to a limited partnership in which the developer is a general partner. The Section 108 loan will be used by the City to acquire the hotel and land from the developer. In the original plan, the developer pledged the proceeds to be received from the City on sale as collateral for the loan, but we were advised by the City's brief that the construction loan as ultimately obtained was not conditioned, as initially envisaged, upon the developer's pledge of sale proceeds (including the City's Section 108 funds) as collateral. The City's brief also informs us that the hotel is nearing structural completion.

■ Plaintiffs, individual low- and moderate-income residents of the City and a community action agency, brought suit in the United States District Court for the Western District of New York, Michael A. Telesca, Judge, challenging the funding of the project and seeking declaratory judgment and injunctive relief.[2] Judge Telesca granted summary judgment for defendants. Three of the original plaintiffs—R. David Duncan, Lillian Langlie, and Opportunities for Broome, Inc.—appeal.

Appellants contend that HUD acted arbitrarily in approving the UDAG and Section 108 funding for the hotel project for three reasons: first, because the City failed to comport with the citizen participation requirements for those programs; second,

---

1. References in this opinion to the Code of Federal Regulations are to that edition revised as of April 1, 1982, which was in effect during the period of the challenged actions. References to 42 U.S.C. §§ 5308, 5318 are to the 1982 edition. These sections have since been amended by Pub.L. No. 98–181, Title I, §§ 108, 121, 97 Stat. 1153, 1168–70 (1983); Pub.L. No. 98–454, Title VI, § 601(c), 98 Stat. 1732, 1736 (1984); and Pub.L. No. 98–479, Title II, §§ 203(*l*), 204(k)(1), 98 Stat. 2218, 2231, 2233 (1984).

2. We agree with the district court that appellants have standing to sue as being arguably within the zone of interest protected by the statutes at issue here, *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), and having suffered actual or threatened injury as a result of the putatively illegal conduct of

defendants, *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). *Evans v. Lynn*, 537 F.2d 571, 590 (2d Cir.1976) (en banc), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977), is inapposite since there the plaintiffs did not reside in the town receiving federal funding, did not allege that they planned to do so, and did not claim that the federal funds whose use they challenged were diverted from projects that could have benefited them. By contrast, appellants here can demonstrate injury: to qualify for the Section 108 loan, the City apparently must use as collateral its future federal CDBG funds, which puts at risk these funds otherwise intended for housing rehabilitation or other community projects that could inure to appellants' benefit.

because HUD's requirement that every public dollar leverage at least 2.5 private dollars was not met; and third, because the Section 108 loan was improperly used to finance new construction. We agree, however, with Magistrate David G. Larimer and the district judge that none of the claims mentioned for declaratory or injunctive relief are availing.

## DISCUSSION

### I. *Citizen Participation.*

■ Municipalities seeking UDAG grants or Section 108 loans are required to hold public hearings to obtain the views of citizens. 42 U.S.C. § 5318(c)(3)(A) (1982); 24 C.F.R. § 570.454(a) (1982), and section 570.303, incorporated by reference in section 570.702. The City's Community Development Department did hold a public hearing on July 27, 1982, in connection with the UDAG application at which the project (then a Marriott hotel to be funded in part by Industrial Development Agency (IDA) bonds rather than with any utilization of Section 108 loan guarantees) was discussed. Information packets were given to those attending, and the major features of the plan—a 220-room hotel, banquet facilities, meeting rooms, retail shops, a high quality restaurant and lounge, recreation facilities, access to the handicapped, and parking for 240 cars—were pointed out. The project, the hearing attendees were told, would be funded by a UDAG grant in the sum of $3 million, IDA bonds in the sum of $7.2 million, and developer cash funding of $1.8 million. City benefits would include a grant to Binghamton, an increase in the City tax base, progress in a deteriorated, vacant area, 200 to 250 new jobs, possible new convention business and good pedestrian access to downtown facilities. The only people speaking against the project at the July 27 meeting were affiliated with, or speaking on behalf of, the Holiday Inn, Howard Johnson's, and the Ramada Inn, other hotels in the vicinity, and were essentially objecting to the competition being financed out of public funds.

Appellants argue that the information provided at the hearing was inadequate since the UDAG application itself was not made available. They claim the information was misleading: the packet indicated the UDAG would be $3 million, but the UDAG application sought $3,206,000 and the grant approved was $3.3 million; while $7.2 million in IDA bonds were contemplated at the July, 1982, hearing, $8 million in bonds were sought and eventually the Section 108 loan proceeds in the amount of $7.3 million replaced the bonds altogether; the information packet referred to 200 to 250 new jobs but the UDAG application stated 280 jobs would be created and the Section 108 loan application ultimately referred to 200 new jobs. We agree with the magistrate that this potpourri of objections does not amount to significant abrogation of the citizen participation process.

Appellants complain that no economic benefit analysis, no affirmative action plan, and no information as to tax revenues, firm financial commitments or minority contractor participation was provided at the hearing. But we agree with the magistrate's conclusion in this case that, since citizen participation must take place "[p]rior to submission of a full application," 24 C.F.R. § 570.454(a) (1982), the applicant is not required to provide all this information at the public hearing.

■ Appellants also argue that changes in the UDAG application amounted to "significant revision[s]" requiring additional hearings pursuant to 24 C.F.R. § 570.463(a) (1982). One such change was the use of the Section 108 loan instead of IDA bonds; a second was the substitution of a different developer. However, additional hearings are required under section 570.463(a) only when a revision "alters the scope, location, or scale of the project or changes the beneficiaries' population." None of these occurred here. Summary judgment as to the issue of citizen participation which respect to the UDAG was properly granted.

■ The City, appellants further contend, "compounded its error by failing to comply with even more explicit citizen par-

ticipation requirements when it completely redesigned the project's financial underpinnings by substituting Section 108 funds for industrial revenue bonds." On January 14, 1983, a hearing as to that substitution was conducted. Appellants claim that the citizens were not provided with "adequate and timely information" within the meaning of 24 C.F.R. § 570.303(c)(4) (1982), "so as to enable them to be meaningfully involved in important decisions at various stages of the program." *Id.* However, the record indicates that the hearing was publicized and that the appellants were quite vociferous in objecting to the project. The minutes reflect that one of the named plaintiffs voiced the concern that "[o]ther projects will have to be sacrificed," referring to the fact that "[t]he amount of [Section] 108 funds the City plans to loan to the project is all that the City has." He also argued that the number of jobs that the project's proponents claimed would be created was exaggerated, pointing to past Binghamton projects where the jobs did not materialize. He was only one of several who spoke against the use of Section 108 loan funds in connection with community development objectives. These comments suggest that the public had adequate information about the project to discuss it meaningfully. In our view, the City complied with the requirements of section 570.303, as incorporated in section 570.702, by "obtain[ing] views of citizens" on the project, 24 C.F.R. § 570.303(a) (1982).

## II. *Leveraging Requirements.*

UDAG grants may be made "only where the Secretary determines that there is a strong probability that (1) the non-Federal investment in the project would not be made without the grant, and (2) the grant would not substitute for non-Federal funds which are otherwise available to the project." 42 U.S.C. § 5318(j) (1982). Thus, among other criteria to be considered in determining which communities will receive UDAGs, the Secretary should consider "the extent to which the grant will stimulate economic recovery by leveraging private investment," 42 U.S.C. § 5318(d)(1)(C)

(1982). In furtherance of these policies, 24 C.F.R. § 570.459(b)(2) (1982) requires that "[e]ach project considered for selection for [UDAG] funding must have a leveraging ration of at least 2.5 to 1.0." 24 C.F.R. § 570.451(*l*) defines "leveraging ratio" as "the total amount of firm private commitment generated by the project divided by the amount of action grant funds awarded to the project." Under 24 C.F.R. § 570.451(i) (1982), "firm private commitment" means that "agreement by which the private participating party in the action grant program agrees to perform an activity specified in the application and demonstrates the financial capacity to deliver the resources necessary to carry out the activity, and commits the resources to the project."

Appellants argue that the Section 108 loan funds are public funds that cannot be considered "firm private commitment," and that the use of those funds in connection with the financing of the hotel project leaves the project short of the requirement that every dollar of public funds generate at least 2.5 dollars of private investment, in violation of HUD's own rules and regulations. *Cf. Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957) (agency must comply with own regulations).

■ Appellants' argument, however, fails to take into account the fact that the developer made a private commitment of funds by personally guaranteeing repayment of the construction loan. It is true that, as originally conceived, the construction loan was conditioned upon execution of an assignment of the proceeds of the Section 108 funds by the City to the bank. Nevertheless, HUD treated the construction financing commitment obtained by the developer as private commitment and also treated the discounted value of the City's loan of its $3.3 million UDAG award to the developer as private funds since both had to be repaid by the developer to the respective creditors with interest. HUD's regulations, which contain a hypothetical example of how to calculate the leveraging ratio,

indicate that the construction loan and the UDAG were properly considered private commitment for purposes of determining the leveraging ratio. *See* 24 C.F.R. § 570.-451(*l*)(2) (1982). In the hypothetical example, set out in the margin,[3] the discounted value of the UDAG grant is counted as firm private commitment, because the UDAG moneys must be repaid with interest to the city.[4] Appellants argue, however, that the example was intended to illustrate how the leveraging ratio was computed rather than to show what type of investment could be considered private. They contend that the "allegedly 'private first mortgage' is nothing more than a mere shell in existence only during construction, guaranteed by an assignment of the Section 108 proceeds and immediately replaced upon completion of the hotel by the public Section 108 funds." If this use of Section 108 funds is to be considered private commitment, the argument runs, a luxury hotel project could be financed with only a UDAG and a Section 108 loan, without any funds from private sources. Appellants claim that the fact that the loan is to be repaid with private dollars is irrelevant, since deeming that to be private commitment would permit private development to be funded entirely with low interest loans from public sources, to be repaid with earnings from the project funded.

But we agree with the appellees that the regulations contemplate that funds to be repaid by a private developer are "private commitment"; whether those funds are loans from a private or public institution is immaterial. The definition of "firm private commitment" does not depend on whether funds that may reach the private developer originated from a public source. The leveraging ratio hypothetical indicates that it is the developer's obligation to repay that makes funds "firm private commitment." The construction loan in this case thus was "firm private commitment" even though there was an agreement that if the project were carried through to completion the City would use its Section 108 loan to purchase it.

■ We do not comment on the wisdom of this method of obtaining the "front end" private sector financial participation envisioned by Congress when it created the UDAG program. *See* H.R.Rep. No. 236, 95th Cong., 1st Sess. 9, *reprinted in* 1977 U.S. Code Cong. & Ad. News 2884, 2892. All we hold here is that, when calculating the leveraging ratio, HUD's own regulations view as "firm private commitment" any funds, regardless of source, that private investors are ultimately liable to repay. The private party need only demonstrate the capacity to deliver the necessary funding to the specific project regardless of source and commit itself to do so.

Appellants claim that, even if the Section 108 loan is deemed "firm private commitment," it should also be considered public when calculating the leveraging ratio; calculating the ratio as appellants suggest yields a ratio far short of the required 2.5 to 1. However, we are precluded from calculating the leveraging ratio as appel-

---

**3.** A hypothetical example illustrates how the leveraging ratio is derived. A private industry agrees to build a widget factory. The company agrees to put $2 million in equity into the plan ($1 million into the construction of the plant and $1 million into working capital), borrows $5 million in a first mortgage from a bank, and says that but for the receipt of Action Grant funds in the amount of $1 million to be used as a second mortgage, the company will not be able to build this project. The applicant agrees to use $500,000 in community development block grant funds to provide off-site improvements. The leveraging ratio would be obtained by adding the $1 million in capital equity, the $5 million first mortgage, plus the discounted value of the action grant second mortgage which

(for the purpose of this example) equals $700,-000. The total amount of firm private commitments equals $6.7 million for a 6.7 to 1.0 leveraging ratio. The $1 million of working capital is not counted for purposes of calculating the leveraging ratio. Inventory would likewise be excluded from calculation in the ratio. 24 C.F.R. § 570.451(*l*)(2) (1982).

**4.** The amount of the UDAG is apparently discounted because the UDAG is repaid at below market interest rates. The private loan, however, is included at face value in determining the leveraging ratio because it is presumably issued at prevailing market rates.

lants suggest by 24 C.F.R. § 570.451(*l*) (1982), which defines the leveraging ratio as "the total amount of firm private commitment generated by the project *divided by the amount of action grant funds awarded* to the project." (Emphasis added.) In this case HUD found the firm private commitment totalled $10,536,248 with a "leveraging ratio" of 3.19 to 1, well above the regulatory requirement. We see no clear basis under the regulations for disturbing that assessment.

### III. *Use of Section 108 Funds for New Construction.*

■ Section 108 loan guarantees may not be used for new construction, 42 U.S.C. § 5308(a) (1982) (Secretary may guarantee obligations issued to finance acquisition or rehabilitation of real property); 24 C.F.R. § 570.701 (1982), but this means only that the funds cannot be lent or provided to a developer prior to or during construction. A community may, however, use the proceeds of its Section 108 loan to acquire a newly constructed project. This procedure is not synonymous with direct funding of new construction since no Section 108 funds will be applied to the project until after construction is completed and no Section 108 funds will be used by the developer to pay any of the ongoing costs of construction. This is true even if the developer pledges its eventual receipt of the proceeds from the sale of the project as collateral to secure private financing for construction and even if it is apparent that the project can only be paid for by the buyer—in this case the City—out of the Section 108 funds. The Section 108 funds still will not change hands until a completed project exists; they are thus used to acquire real property as authorized by the statute and regulations. That the developer is a partner in the operating partnership receiving the lease-back does not, standing alone, render the transaction a sham in which Section 108 funds are in fact to be used for new construction.

Appellants do not demonstrate any statutory or regulatory violation by HUD or by the City. Therefore, we affirm the judgment.